UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No.: 23-10127-LTS |
| | ) |
| 1. RAFAEL DAVILA, | ) |
|    a/k/a "Robbin Hood," | ) |
|             Defendant. | ) |

**UNITED STATES' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY ORDER OF FORFEITURE WITH RESPECT TO CONTESTED ASSETS (DOC. 254)**

As discussed at the July 23, 2024 status conference (*see* Doc. 265), the United States of America respectfully provides this reply in support of its Motion for Preliminary Order of Forfeiture with Respect to Contested Assets (Doc. 254) and in response to the Defendant Rafael Davila ("Defendant's") opposition to the same (Doc. 264, the "Opposition").

### A. The Court Can Order Forfeiture of Assets Acquired Prior to 2022

In his Opposition, the Defendant asserts that forfeiture for certain assets is unavailable because they were acquired "prior to the date of the Target Offenses as set for[th] in the Indictment." Doc. 264 at 2. In particular, Defendant states that "[t]he Indictment alleges that Davila committed the Target Offenses on a diverse set of dates in 2022 and 2023." *Id*. He further contends that "[t]he Indictment does not allege—and Davila has not admitted to—the commission of any offenses prior to the dates alleged in the Indictment." *Id*. The Defendant concludes that there is thus no forfeiture nexus for assets acquired prior to 2022. *See id*. at 2-3. The Defendant is incorrect for at least two reasons.

#### 1. The Charged Conspiracies Are Not Limited to Events in 2022 or Later

*First,* the Indictment is not limited to events occurring in 2022 and later, as the Defendant contends. While the Indictment does describe specific acts throughout 2022 and 2023, the

charges are in fact broader.   As relevant here, Count One, which charges Conspiracy to Transport Stolen Goods Valued Over $5,000 in Interstate Commerce in violation of 18 U.S.C. § 371, is alleged to have occurred "[f]rom a date unknown to the Grand Jury, but **_at least January 1, 2022_**, and continuing through April 12, 2023. . . ."   Doc. 41 at 15.[1]   Likewise, Count Seven, which charges Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h), is alleged to have occurred "[f]rom a date unknown to the Grand Jury, but **_at least on or about January 1, 2022_**, and continuing until April 12, 2023. . . ."   _Id_.   Thus, by their very terms, the respective conspiracy charges at issue—conspiracy charges to which the Defendant pled guilty—are inclusive of activity prior to 2022.

And indeed, there is evidence that the Defendant was engaged in the conspiracies prior to January 2022, in fact dating back to the first quarter of 2020.   For example, as described in the presentence report ("PSR")[2]:

> Investigators located numerous text messages between R. DAVILA and the manager of Accurate Converter, Cody Skelton ('Cody').   The text messages were dated from March 2020 to May 2022 and contain the coordination of multiple trips to the 'Shop.'   As far back as March 2020, there are numerous exchanges where R. DAVILA and Cody discussed prices for certain types of catalytic converters.   R. DAVILA demonstrated extensive knowledge of the market for precious metals and negotiated prices per converter with Cody.

PSR at ¶ 258.   The Defendant's co-conspirator, referenced throughout the PSR as "CW-1," explained that Accurate Converter was a business utilized by the Defendant and CW-1 historically to sell stolen catalytic converters.   _Id_. at ¶ 296.   Among the documents located in the Defendant's residence were receipts from Accurate Converter reflecting the sale of converters, including four

---

[1] Unless otherwise noted, all emphases have been added.

[2] The parties are in the process of submitting objections to the PSR; the objections thus have not yet been resolved.

receipts that pre-date 2022, specifically: February 24, 2020; February 28, 2020; May 13, 2021; and December 11, 2021. *Id*. Each of those four receipts was in the name of "Juan Valez." *Id*. The Defendant was known to employ false names when dealing with Accurate Converter. *Id*. at ¶ 297. Additionally, investigators located an 11-page price list dated February 3, 2020, which listed numerous makes and models of catalytic converters and a cash price. *Id*. at ¶ 296.

Moreover, CW-1 himself provided grand jury testimony that in addition to the approximately 500 catalytic converter thefts specified in the Indictment, the Defendant was responsible for committing approximately 275-300 additional catalytic converter thefts during the period of 2020 through 2022. PSR at ¶ 245; *see also id*. at ¶¶ 250-257. These catalytic converter thefts were committed with CW-1 and CW-1's brother Luis Ramos up until Luis's death in March 2021. *Id*. at ¶ 245.[3] After Luis's death, CW-1 took a break for approximately two months and then resumed stealing converters with the Defendant until the Defendant hurt his leg while jet skiing in the summer of 2021. *Id*. at ¶ 254.

2. In Any Event, Proceeds from Uncharged Conduct that was Part of the Same Scheme are Forfeitable

**Second,** even if the Court were to find that acts taking place prior to January 2022 fall outside of the charged conduct, that still would not preclude the Court from finding that assets acquired prior to that date are subject to forfeiture. In *United States v. Cox*, the defendant contested the forfeiture figure ordered by the district court on the grounds that the amount included not only proceeds the defendant received from the convicted transactions[4], but also proceeds he

---

[3] The PSR indicates that Luis Ramos was murdered in April 2021; in fact he was murdered on March 12, 2021.

[4] The defendant in *Cox* was convicted of various counts of wire fraud and bank fraud, as well as an unlawful monetary transaction. 851 F.3d at 119.

received from uncharged relevant conduct. 851 F.3d 113, 127 (1st Cir. 2017). The First Circuit rejected the defendant's argument, and held that "a court may order forfeiture of the proceeds from uncharged conduct that was part of the same fraudulent scheme alleged in the counts of conviction." *Id*. at 128. The Court also noted that "[i]n the context of an extended scheme, uncharged and acquitted conduct is 'relevant conduct' if it is part of the same 'course of conduct or common scheme or plan' as the conduct underlying the counts of conviction." *Id*. at 121. The First Circuit further held that because a forfeiture award is part of sentencing, the court need only apply a preponderance of the evidence standard when determining that the uncharged and acquitted conduct was part of the same scheme as the counts of conviction. *Id*. at 129.[5]

In the instant case, there is ample evidence from which the Court can determine that the conduct in which the Defendant was engaged dating back to 2020 was part of the same "course of conduct or common scheme or plan" as the offenses of which he was convicted. The Defendant was the central figure of this conspiracy that employed the same center of operations (799 S. West Street) from 2020 through 2023. While other co-conspirators participated with the Defendant for certain thefts, the Defendant participated in all of them. The Defendant undertook all of those thefts through the same modus operandi, the same planning and orchestration, the same tools and

---

[5] The Defendant cites *United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007) as a case in which the court "vacat[ed] forfeiture of assets predating offenses charged in [the] indictment." Doc. 264 at 2. But *Capoccia*—an out-of-circuit case which predates *Cox*—is distinguishable in that the relevant conviction in *Capoccia* did ***not*** involve a "scheme, conspiracy, or enterprise," and thus conduct which predated the offenses of conviction could not be adequately linked to those discrete offenses. *See id*. at 110, 117-18. The *Capoccia* court itself recognized that "[w]here the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise, the government need only establish that the forfeited assets have the 'requisite nexus,' Fed.R.Crim.P. 32.2(b)(1), to that scheme, conspiracy, or enterprise." *Id*. at 117-18. Indeed, *Capoccia* is cited by the First Circuit in *Cox* for that very proposition. *See Cox*, 851 F.3d at 127, n.12.

blades, and employed the same methods and means to steal catalytic converters and monetize them. Indeed, the Defendant's detailed notes memorialized the historical thefts and towns that he had targeted 2020, just as he memorialized the thefts committed and converters sold in 2022 and 2023.

### B. There is Sufficient Evidence from Which the Court Can Determine that the Vehicles at Issue Were Acquired During the Period of the Conspiracy

In his Opposition, the Defendant argues that with respect to certain vehicles—specifically, the Green Dirt Bike, Blue/White BMW RR Sport Bike, Orange Honda CBR 600RR, Blue/Silver Sherco Dirt Bike, and 2017 Red Suzuki—"the government has no affirmative evidence regarding the precise date as to when the Defendant acquired them" and thus the government's forfeiture theory is speculative. Doc. 264 at 4-5. As an initial mater, the government disputes the characterization of the evidence it has put forth thus far; while there is indeed a lack of formal paperwork for these bikes, that is consistent with the Defendant's practice of purchasing assets in the names of others or simply not registering them at all. In support of its forfeiture motion, the government has cited to (1) the Defendant's own admission that he "drives his bank account" and that he has "over 200K in assets"; (2) photographs and texts showing the Defendant's ownership and/or control over the vehicles (as shown and described in the affidavit of Trooper Melberg); and (3) the Defendant's lack of legitimate income that would explain the purchases of these bikes. Doc. 254 at 7-8. Taken together with the Defendant's convictions, this is sufficient under the preponderance standard to establish a factual nexus between the property and the offenses of conviction. The Defendant should not benefit from his practice of obfuscating his interest in assets.

In addition to the foregoing, the government provides the attached affidavit of CW-1, incorporated herein, setting forth his personal knowledge and observations regarding the

Defendant's acquisition of (1) the Green Dirt Bike, (2) the Blue/White BMW RR Sport Bike, (3) the Orange Honda CBR 600RR, (4) the Blue/Silver Sherco Dirt Bike, and (5) the 2017 Red Suzuki. *See* Exhibit A.  CW-1's affidavit provides further evidence that each of these bikes was purchased with proceeds of the catalytic converter thefts and the timing of the Defendant's acquisition of the bikes.[6]

### C.  Conclusion

For the foregoing reasons, the government respectfully requests that the Court grant its Motion for Preliminary Order of Forfeiture with Respect to Contested Assets (Doc. 254).

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | JOSHUA S. LEVY<br>Acting United States Attorney, |
| By: | */s/ Alexandra W. Amrhein*<br>PHILIP A. MALLARD<br>ALEXANDRA W. AMRHEIN<br>Assistant United States Attorneys<br>United States Attorney's Office<br>1 Courthouse Way, Suite 9200<br>Boston, MA 02210<br>(617) 748-3100 |
| Date:   August 13, 2024 | Alexandra.Amrhein@usdoj.gov |

---

[6] CW-1's affidavit also includes testimony regarding the two jet skis at issue (a Sea Doo and a Kawasaki), and supports the government's position that the jet skis were also purchased with proceeds of the catalytic converter thefts.