UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 23-cr-10127-LTS |
| RAFAEL DAVILA, a/k/a "Robbin Hood", | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**[1]

The government submits this memorandum in support of its recommendation for **198 months of incarceration** for the Defendant, followed by three years of supervised release. The Defendant was the leader of a prolific theft ring that caused millions of dollars in damage to innocent victims, and netted hundreds of thousands of dollars in profit for himself.  This is nothing new: he is a career criminal and thief, who has stolen property from innocent victims over his entire adult life.  He remains unrepentant and largely incapable of rehabilitation: numerous arrests and convictions and years of prison over his life of crime have done nothing to deter him from harming others.  Indeed, this entire case took place while the Defendant was on probation from a prison sentence for yet another theft.

A sentence of 198 months reflects an appropriate punishment for the crimes charged here, adequately considers his lifetime of theft and crime, will protect the public from the Defendant,

---

[1] The government refers to the United State Probation Office as "Probation", the Presentence Report ("PSR") by page (PSR p. _), or paragraph (PSR ¶_), and references to the docket are by entry number (ECF #_).  In addition to the content of the PSR, the government submits a report concerning the recent catalytic converter theft activity as Exhibit 1 – the government reports only two additional thefts since that report was authored. The victim impact information is summarized from the Victim Questionnaire Spreadsheet is attached as Exhibit 2 and is referenced by the stated Victim number in the spreadsheet (Victim #_).  Additional victim impact statements are filed with the Court in redacted form as Exhibit 3,4, and 5.

and fully accords with the sentencing factors under Section 3553(a).

## THE ADVISORY SENTENCING GUIDELINES & PSR

### I.    OFFENSE LEVEL

The government disagrees with the offense level calculation in the PSR, which calculated the offense level to be 31 (PSR ¶¶335-348).  The government lodged specific objections to PSR including: (1) the inclusion of only half of the thefts reported by CW-1 that would have increased the offense level by two; (2) the failure to find the two-level increase for the three firearms possessed by the defendant in his residence and vehicle under USSG 2B1.1(b)(16)(B); (3) and the failure to find the two-level obstruction of justice enhancement based on the Defendant's false statements to police concerning the Dodge Challenger and to Probation concerning his income. The government's substantive arguments regarding its objections to the PSR are set forth in the addendum to the PSR, and the government further presses the objections to loss amount and firearms enhancement.

Consequently, the government takes the position that the Adjusted Offense Level for Group One _should be 38_. Then, acceptance of responsibility furthers reduces the offense level by 3. Therefore, the government believes the Total Offense Level should be 35.  With a criminal history score of nine, the Defendant's undisputed criminal history category is IV (PSR ¶¶364-366).

### II.    OBJECTIONS TO OFFENSE LEVEL CALCULATION IN PSR

"It is the government's burden at sentencing to prove sentencing enhancement factors by a preponderance of the evidence, and a district court may base its determinations on 'any evidence that it reasonably finds to be reliable.'" _United States v. Lacouture_, 835 F.3d 187, 189–90 (1st Cir. 2016) (quoting _United States v. Almeida_, 748 F.3d 41, 53 (1st Cir. 2014)). A "'preponderance of the evidence' means 'more likely true than not.'" _Diaz-Alarcon v. Flandez-Marcel_, 944 F.3d 303,

305 n.2 (1st Cir. 2019) (quoting *United States v. Marino*, 833 F.3d 1, 8 (1st Cir. 2016)).

A.    **The Court Should Find the Total Loss is Over $3,500,000 and Increase the Offense Level by 2 Under USSG § 2B1.1(b)(1)(J)**

In the PSR and Exhibit A to this memorandum, CW-1 testified under oath to the commission of an additional 275 to 300 thefts with the Defendant. *See* PSR ¶¶250-258. The Court should credit CW-1's sworn testimony that the Defendant is responsible for an additional 275 to 300 converter thefts during the period of January 2020 through the summer of 2022.[2] The facts taken from this sworn testimony, and corroborated by receipts, documents, text messages, and the Defendant's own notes concerning these historical thefts, are set forth in the PSR. These facts remain undisputed by the Defendant, who did not raise a competent objection to their inclusion.

"In arriving at a loss figure, a sentencing court is free to consider both losses stemming directly from the conduct underlying the offenses of conviction and losses stemming from any relevant conduct (including uncharged conduct). *United States v. Flete-Garcia*, 925 F.3d 17, 28 (1st Cir. 2019). "The sentencing court has considerable discretion in determining what evidence should be regarded as reliable in making findings as to the amount of loss." *Id.* (citing *United States v. Sklar*, 920 F.2d 107, 110 (1st Cir. 1990)). In making its finding, "[t]he district court 'may rely on the [PSR], affidavits, documentary exhibits, and submissions of counsel." *United States v. Curran*, 525 F.3d 74, 78 (1st Cir. 2008) (quoting *United States v. Ranney*, 298 F.3d 74, 81 (1st Cir. 2002)).

Probation did not entirely credit CW-1's testimony and elected to include only 150 of the 300 vehicles in its loss calculation. This inclusion of only 150 vehicles supported an increase of

---

[2] CW-1's grand jury testimony substantiating these facts is included as an Exhibit to this memorandum under seal. *See* Exhibit A. Additionally, to the extent that any competent dispute is raised by the Defendant as to the facts asserted by CW-1 at the hearing itself, the government will simply call CW-1 as a witness.

the loss amount of $750,000. With the prior established loss at $2,741,944 (PSR 336), the inclusion of an additional $750,000 resulted in a total loss of $3,491,944, which is only $9,000 from triggering an increase of 2 offense levels under USSG § 2B1.1(b)(1)(J)).   *See* PSR ¶336. Probation's inclusion of only half the thefts was inappropriate.

This Court should not discount the undisputed testimony of CW-1 that supported the increased loss amount. *See* Fed. R. Crim. P. 32(b), (i) ("At sentencing, the court ... may accept any undisputed portion of the presentence report as a finding of fact.").   The government requests that the Court properly determine the loss calculation to be $4,116,944, and that the offense level is increased by +18 for loss amount under USSG §2B1.1(b)(1)(J)).

### 1. The Defendant's Objection to the Thefts Described by CW-1 is General, Unsupported, and Should be Overruled

As an initial matter, the 275 to 300 additional thefts are undisputed, because the Defendant's objection to CW-1's testimony regarding the additional thefts should be rejected out of hand. His objection is conclusory and unsupported, claiming only that "CW-1's testimony is uncorroborated and unreliable." PSR p. 137, Objection 4. This is not a competent objection.

There is no confrontation right at a sentencing hearing, and this Court should not consider the Defendant's rhetorical and unsupported objections.  *See United States v. Olivero*, 552 F.3d 34, 40 (1st Cir. 2009) (where "defendant's objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR"); *United States v. Prochner*, 417 F.3d 54, 66 (1st Cir. 2005) (upholding reliance on a PSR's listing of victims and loss amounts "[i]n the absence of rebuttal evidence beyond defendant's self-serving words"). The Defendant certainly could have provided a contrary affidavit or disputed any of the specific facts asserted by CW-1. However, he chose not to do so.

"Indeed, there is no genuinely disputed evidence at issue in this case. [The Defendant's]

objections, at bottom, are merely rhetorical assertions that the evidence before the court [is] insufficient to support the relevant conduct determination." *United States v. Cox*, 851 F.3d 113, 123–24 (1st Cir. 2017). Consequently, the thefts described by CW-1 are effectively undisputed and the loss amount should be increased to over $3,500,000, and the offense level consequently increased by an additional 2 levels under USSG § 2B1.1(b)(1)(J). *See e.g.,* PSR ¶245 (total thefts of 775 to 800 converters, at an estimated loss of $5,000 each, equating to $3,875,000 for catalytic converter theft alone).

### 2. The Undisputed Testimony of CW-1 was Amply Corroborated and Should be Credited

Probation's explanation for not including the additional thefts in the calculation, though including the factual basis in the PSR, need not detain the Court.  In declining to amend the PSR consistent with the government's objections, Probation claimed that there was an "insufficiency of corroborating evidence as to quantities and amounts of thefts between 2020 and 2021."  This was plainly incorrect (not to mention internally inconsistent with their inclusion of 150 thefts).

To start, CW-1 was a trusted insider and coconspirator with the Defendant on numerous crimes.  CW-1's testimony was direct, specific, and contained numerous details that only a participant and insider would know.  Such testimony alone is sufficient to support the inclusion of the thefts, much as it would be sufficient to support a conviction beyond a reasonable doubt. *See United States v. Rosario-Diaz*, 202 F.3d 54, 67 (1st Cir. 2000) ("Appellants correctly note that we have held the uncorroborated testimony of a cooperating accomplice sufficient to sustain a conviction, unless that testimony is facially incredible."). Beyond that, CW-1's testimony was in fact entirely corroborated by the digital, physical and documentary evidence set forth in the PSR.

As an initial matter, the government found five receipts during the search of the Defendant's residence showing that the Defendant sold 60 converters on five separate dates in

2020 and 2021 to the same business described by CW-1 as buying the stolen converters. *See* PSR ¶¶296-297; Exhibit 6. The government also produced over 60 pages of text messages between the Defendant and the named employee of this business during this time period (March 2020, through March 2022). *See* PSR ¶258; Exhibit 7. These text messages support numerous drop-offs on dates that differ from the ones reflected in the receipts – thereby increasing the number of documented thefts and transactions,[3] and further corroborating the number of thefts reported by CW-1. It bears repeating that these eighty or so sales, are only the transactions for which the Defendant decided to keep the receipt of the sale of the stolen converter from years past in his house or happened to memorialize a drop-off or amount in writing. Many more sales, inferably, took place on the same biweekly pattern, and readily support the 300 additional thefts being included.

As further corroboration, the FBI's Cryptoanalysis Unit conducted a forensic review of the notes found in the Defendant's phone that reflected dropped off converters. That review determined that the notes and records from the Defendant's phone referenced 1,755 catalytic converters being sold. *See* PSR ¶32. This alone would readily support the inclusion of the 300 additional thefts. Additionally, the Defendant's bank records and assets that he accumulated, including one of the motorcycles that he bought from his deceased coconspirator showed deposits consistent with catalytic converter theft dating back to this period. *See* ECF #254-1 (affidavit of Trooper Melberg). Further, the Defendant also had a number of notes in his phone dated from September 8, 9, & 14, 2020, where the Defendant listed locations consistent with targeting them for catalytic converter theft, much as he did in 2022 and 2023. *See* Exhibit 8. All told, the additional 300 thefts have been proven far beyond a reasonable doubt, let alone by a preponderance

---

[3] *See e.g.*, Exhibit 7, p. 20 (dropping off on August 18, 2020), p. 26 (dropping off eight converters on August 25, 2020), p 46 (dropping off four converters on January 6, 2022).

of the evidence. The loss amount should be amended to over $3,500,000, and the offense level increased by 2 under USSG § 2B1.1(b)(1)(J).

### B.      RECKLESS FLIGHT & FIREARMS

As the government noted in its objection, Probation elected to increase the offense under USSG § 2B1.1(b)(16)(A) for reckless conduct (PSR ¶340), and not under USSG § 3C1.2. Relatedly, Probation also failed to increase the offense level under USSG § 2B1.1(b)(16)(B) for possession of a firearm in connection with the offense. The government argues that the offense level should be increased by 2 level under USSG § 3C1.2 (as opposed to § 2B1.1(b)(16)(A)), and also by 2 levels under USSG § 2B1.1(b)(16)(B) based on the firearms. *See* PSR p. 122 (Objection 2) & 128 (Objection 3). This would result in a net increase of the offense level by 2.

Alternatively, there would not impermissible double-counting if the Court were to find USSG § 2B1.1(b)(16)(A), (b)(16) (B), and USSG § 3C1.2 all proven. The note to USSG § 3C1.2 indicates that the adjustment should not be applied if it "results in an equivalent or greater increase in offense level *solely* on the basis of the same conduct" (emphasis added).  If both grounds under § 2B1.1(b)(16) were found proven, then the offense level would not be increased "solely on the basis of the same conduct" and USSG § 3C1.2 could be applied as well.  If the Court were to not do so, then these three firearms would not find any reflection in the guideline calculation for the Defendant.[4]

#### 1.  Firearms in Connection with the Offense

This Defendant possessed three firearms. Two were in his residence, along with dozens of stolen catalytic converters, hundreds of pieces of stolen jewelry, reams of paper records of his

---

[4] If the Court were to overrule the government's objection on this point, then the government would argue that these firearms support an upward departure, upward variance, and upward movement within the guidelines sentence range.

thefts, a high-end sports car in his driveway, and six motorcycles in his basement. He also had another firearm in the Chevrolet Suburban (PSR 227, 289), a vehicle that the Defendant used frequently in connection with the thefts and transportation of the stolen converters. The Defendant drove the converters to Jose TORRES' residence and transacted them in this vehicle, and also drove with MARSHALL to Florida in the Suburban. *See* PSR ¶¶77-83, 84-88, 116-117, 311, 316-328.  The Defendant would also frequently take the Suburban to Home Depot to obtain supplies and blades for the nights of theft. *See* PSR ¶207 Lastly, the Suburban was also purchased by the Defendant and placed in his father's name to obscure the true ownership and source of funds.  *See* ECF #254-1.

That the Defendant kept and maintained a firearm in the center console of the Suburban shows that he intended to protect himself and the stolen property that he routinely transported in it. Based on the number of firearms he had in his possession, the fact that they were loaded, the Defendant's central role in the thefts over multiple years,[5] and the proximity of the firearms to the tools, proceeds, and stolen property, and the presence of a firearm in a vehicle used squarely in furtherance of the transportation and laundering, these firearms were possessed in connection with the offenses. In its objection, the government cited numerous analogous cases supporting its position that the offense level should be increased by 2.  *See* PSR p. 122, Objection 2.

### 2.  Reckless Flight Under USSG § 2B1.1(b)(16)(A) and USSG § 3C1.2

Next, it is important to note that the offense characteristic under § (b)(16)(A) and the adjustment under § 3C1.2 are similar, but distinct.  The offense character under § 2B1.1(b)(16)(A) provides for a 2-level increase if the offense "involved" (A) the conscious or reckless risk of death

---

[5] As compared to the limited number of thefts that Nicolas Davila and Feliberty participated in committing.

or serious bodily injury. On the other hand, § 3C1.2 provides for a 2-level increase "if the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer."

Probation now notes that "the defendant's reckless conduct in fleeing from law enforcement is best captured in USSG § 2B1.1(b)(16)(A), rather than USSG § 3C1.2, and that such determination is consistent with the Court's prior determination at the sentencing of codefendant Zachary Marshall, who was also involved in several high-speed chases." PSR Response to Objection 3, p. 129.[6] To start, by the very terms of the note to the adjustment,[7] USSG § 3C1.2 could not apply to Marshall at all. He was not the driver and could not be held accountable for the Defendant's conduct.  In further contrast, Marshall was not connected to any firearm let alone three of them.

While the transportation crimes involved reckless conduct, the circumstances of all the reckless conduct took place while in the course of fleeing from flaw enforcement.  Even in their response Probation acknowledges this to be the case.  Given the context, and the potential for undercounting of facts that would not otherwise be accounted-for under the guidelines if only the increase under USSG 2B1.1(b)(16)(A) is applied – specifically the undercounting of three firearms, the government believes the offense level should also be increased by 2 levels under USSG § 3C1.2.

## III.    GUIDELINES SENTENCE RANGE ("GSR")

Under the government's offense level calculation, the adjusted offense level is 35, and

---

[6] Of course, it was the government's objection to the PSR for Marshall that resulted in the enhancement being applied in that instance despite Probation not initially including it.

[7] *See* USSG § 3C1.2, n. 5 ("Under this section, the defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused").

criminal history category is IV. Therefore, the government believes the GSR should be at least 235-293 months.  In the event that the Court does not agree with the government's offense level calculation and to the extent necessary, the government makes its sentencing recommendation of 198 months irrespective of the final guideline calculation, as an upward variance. If the government were to prevail on its objections, it would still be seeking 198 months as a downward variance.

<u>**ARGUMENT**</u>

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2).  Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment.  <u>See</u> 18 U.S.C. § 3553(a)(2)(A).  The sentence must also afford "adequate deterrence" for both the defendant and others.  <u>See</u> 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct").  Lastly, the sentence must protect the public from the further crimes of the Defendant.  <u>See</u> 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant").  Consideration of the § 3553(a) factors demonstrates that a sentence of 198 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

## I.    NATURE AND CIRCUMSTANCES OF THE OFFENSES

The Defendant participated in essentially three separate types of crimes – all of which he organized and all of which targeted others. The first is the catalytic converter theft conspiracy. The second is the jewelry store burglaries with FELIBERTY and OYOLA. The third is the ATM theft conspiracy that was also committed with FELIERTY and OYOLA. Each of these conspiracies netted the Defendant thousands of dollars in profit and caused millions of dollars in losses.  On

their own, each would merit a significant sentence.  When all three are considered together, coupled with the fact that the Defendant is a lifelong criminal with numerous prior sentences, and that he was the leader in each instance, this Court must sentence the Defendant to a lengthy term of prison of more than 16 years.

### A.  CATALYTIC CONVERTER CONSPIRACY AND THEFTS

The Department of Justice prioritized the investigation and prosecution of catalytic converter thefts due to the rising number of thefts across the country.[8]  Those cases essentially involved targeting the businesses profiting from the purchase of stolen converters from the thieves and sale of the "cores" to other entities. *See* PSR ¶¶7-9. Unlike those other prosecutions, Operation Cut & Run investigated the actual thefts, identified the suspects and sought to hold them accountable for the specific crimes that they committed. In so doing, this case is unique in that the actual thefts were proven, and the specific victims' impact would therefore directly factor into the Court's decision-making at sentencing.  In short, this entire investigation was predicated upon targeting those who themselves were doing most harm to businesses and residents, and holding them accountable for the frustration, stress and financial costs they imposed on the lives of others.[9]

To be sure, thefts from about 500 vehicles were specified in the Indictment conspiracy. However, there is certainly reason to believe that many more were committed prior to 2020 (see e.g., Exhibit A), and also during the period of 2022 to April 2022.  Even so, this case and the nearly unprecedent number of actual thefts charged against the actual thieves is unique in the country.

---

[8] *See* Department of Justice, Press Release, "Justice Department Announces Takedown of Nationwide Catalytic Converter Theft Ring," November 2, 2022, available at https://www.justice.gov/opa/pr/justice-department-announces-takedown-nationwide-catalytic-converter-theft-ring (press release related to prosecution of DG Auto and related defendants in the Eastern District of California, and Northern District of Oklahoma).

[9] And in so doing, this case revealed that the same large-scale buyers targeted in other prosecutions for the business were profiting from these Defendants actual thefts as well.

### 1. Catalytic Converter Thefts Committed by this Defendant

This Defendant is responsible for each and every theft in this case. That is 800 catalytic converter thefts taking place between January 2020 and April 2023, and roughly five hundred from March 2022 to April 2023. The Defendant committed all of these thefts, planned all of them, drove hundreds of miles per night for all of them, and brought a rotating cast of conspirators to assist him. Once they had stolen the converters, the Defendant handled all of the transactions to turn the stolen converter into cash. He was the indispensable man and central figure in the conspiracy.

### 2. Sophisticated Nature & Repetitive Conduct

This is not merely a property crime. For well over a year, this conspiracy stole hundreds of catalytic converters and made hundreds of thousands of dollars in profit. The crimes demonstrated a honed precision in their execution, and expertise in their planning and concealment. These crimes were not borne of desperation or some passing opportunity that presented itself. The Defendant was not down on his luck or suffering from addiction, or some other issue. Far from it – these crimes were the product of concerted effort, discernment, expertise and an overarching goal of making as much money as possible. He has been stealing from others for years. Catalytic converters were just another way for the Defendant to enrich himself. And, as the government describes below, the Defendant profited greatly from these crimes.

The Defendant and his crew of thieves were skilled and well-prepared. The catalytic converter thefts were facilitated through the use of an internet application that provided real-time pricing for catalytic converters, quantifying the commodity prices of the amounts of precious metal in a particular vehicle's converter. See PSR ¶¶13, 30. The Defendant paid a fee to have access to such inside information about the value of what he was planning to seal (PSR ¶30).

Equipped with special knowledge of the values on the black market and technical skill with vehicles, the Defendant and his crew targeted specific makes and models of vehicles to maximize the profits. PSR ¶¶18. They devoted time and energy to locate places and businesses where large numbers of these vehicles were located in order to obtain an economy of scale. On occasion, they would drive all night and pin all the cars they wanted to get that week. *See* PSR ¶255. On multiple nights per week, the Defendant would travel hundreds of miles -- driving hours on end -- to specifically target businesses whose fleets were comprised of highly valued vehicles.

The Defendant targeted vehicles along carefully mapped routes and used tools and implements purchased purposefully for the crimes. *See* PSR ¶¶250-275; Exhibit A.   This Defendant is one who found the places to hit, mapped them, paid for the digital applications to create an efficient route, purchased the tools and blades and gas, and, in a general sense, planned everything out. He spent hours doing what he described as "homework" to identify where they would be found. With the benefit of such intricate planning, these became brazen crimes.

The system allowed the Defendant to steal from dozens of vehicles in a single night, methodically striking each truck or van parked at a business, or boldly entering onto a driveway or parking lot to target a resident's personal vehicle parked outside.  For each victim, the Defendant plainly did not care how their crimes would affect them. And he also did not fear law enforcement. If he was caught, he could readily expect little in the way of a sentence. And that is only in the very limited chance that he was apprehended.  The Defendant had taken extensive care to conceal himself and not leave a discernible trail that could be followed by investigators. And if he happened to be unlucky enough to come across police, all he had to do was cut the lights, and increase his speed on the highway, forcing the police to risk a high-speed chase, while he was driving a vehicle with plates that were not linked to him.

The Defendant obtained a specific vehicle well-suited to the job and was equipped with anonymous license plates that he, ironically, believed would not provide an avenue of investigation for law enforcement. They disabled cellular phones and travelled hundreds of miles on most trips in order to spread their crimes across the state and region.  Their tools had sharp blades and fresh batteries. They deployed these tools and implements with skill, and they were underneath a vehicle with the reciprocating saw within seconds. For most thefts, it would take less than a minute to remove the converter from the vehicle and move on.  And on the rare occasions when they were seen, they undertook high speed chases to avoid being caught by responding police.  In general, the Defendant operated this conspiracy with a sense of impunity that was the product of an extremely successful system that had resulted in hundreds of thefts, hundreds of thousands of dollars in profit to the Defendant and his coconspirators, and millions of dollars in losses to victims. The nature of these offenses aggravates this crime and requires a substantial sentence.

### 3.  Victim Impact

There are over 300 separate victims in this case. It is the rare instance where hundreds of individual victims of an offender over more than a year can be identified. Here, of course, the 300 identified victims are only the start, and many more were unidentified. The victims include businesses and individuals from all walks of life and all parts of Massachusetts and New Hampshire. They included a food pantry, families, automotive businesses, tradesmen, a bakery, single parents, a home healthcare provider, and the elderly. For each, the conspirators would target their vehicle, steal its converter, and they would have to deal with the vehicle being disabled for potentially weeks on end.

While it may not seem so, this case proves that catalytic converter theft is a profoundly personal crime, even for the businesses who were targeted. For individuals, there is a significant

sense of violation in the theft, because their vehicle is usually parked close to where they were sleeping. Furthermore, there is an element of surprise in the morning when you learn that this has happened essentially right under your nose and on the property you own. Individual victims are left wondering why they were targeted and whether there was some larger and more personal motive for the crime. A number of victims have provided specific information to inform the Court about how the loss of their vehicles upended their lives and affected them emotionally, personally and financially. Their sense of safety and security were entirely destroyed by these crimes.

For individual victims, the impact is readily identifiable and understandable. Consider how your life would be affected if in the moments you went to use your car in the morning you learned it was damaged and would be unavailable for the rest of the week or potentially a few weeks, while you wait for replacement parts. The simple act of going to work and getting your family ready for that day is completely destroyed. Then consider the loss of your vehicle for weeks, the stress created in getting things accomplished and meeting obligations both personal and professional, the time that these problems take from you and your family, and the unnecessary stress and costs you have to bear, after already playing by the rules of society in every other respect. In stark contrast to his victims, the Defendant has essentially never played by the rules, basically never earned a legitimate income, and created all of these harms for hundreds of victims in order to make a paltry of sum of a few hundred dollars each.

Businesses suffered as well. They would see their trucks or vans disabled for weeks on end and then be forced to bear out of pocket costs for repairs and rental vehicles. But that is only their bottom line. The goodwill of the businesses and their ability to succeed in the future also deteriorated as well. Their customers would be left waiting for deliveries or service calls that could not be made, and workers were forced to make do with their own vehicles or schedule work when

other trucks were available. For some businesses, who were targeted on multiple nights, these crimes also created a sense of impending disaster that they felt in addition to the financial losses. This Court should consider the fear and foreboding that invaded the minds of the business owner or operations manager, who knew that it is only a matter of time before the thefts and disabling of their trucks would happen again, forcing them to endure another round of a multi-week repair cycle and thousands of dollars in costs. One bakery was targeted by this Defendant on five separate nights at three of its locations and suffered damage to forty-two (42) of its trucks over a single year.[10]

The victim statements expressing these sentiments can be summarized as follows:

- A "medical/life sciences supply company" in Canton, MA reported being targeted on two nights for five vehicles and suffering $12,114 in costs. <u>See</u> Victim #1. They lost the use of their vehicles for over 60 days collectively but were able to use other vehicles to perform all the deliveries. This victim reported: it is a "small minority owned company" that is operating in a crowded industry and as such we run on very slim margins." *See* Exhibit 3. The victim reports:

  > From a processing standpoint, at that particular time we were fortunate enough to have enough vehicles to cover deliveries, so impact to us serving our customers was minimal. We did, however, have to take a hit financially to the amount of $12k to offset the cost of repair that insurance didn't cover.

  > Not only did this theft have an impact on our bottom line, it also took a bit of a toll on us psychologically. Our trucks were locked up in an area of the property that was lighted, fenced in with barbed wire. This did not deter the thieves from coming in and cutting our vehicle's exhausts into pieces. We shared the video of both events with the Canton police. Basically, we felt helpless!!!! Every Monday I would dread coming into the office and having a driver tell me, 'we got hit again'.

Exhibit 3.

- One individual reported that they "had to share cars with [their] Fiancé and there were several days I was unable to drive to work because of schedule conflicts." <u>See</u> Victim #2.

---

[10] This bakery has since closed 28 outlets in the northeast. https://www.nbcboston.com/news/national-international/bakery-outlets-close-across-new-england/3337327/. The Defendant causing them over $200,000 in losses, certainly did not help.

- An automotive business reported that their customer's truck was targeted, and their business was impacted, and the "theft forced [the business] to reevaluate our policy of leaving our customers vehicles outside our gate" and "[p]revent[ed them] from accommodating our customers['] requests" in the future. <u>See</u> Victim #3. Insurance paid the repair claim, which was nearly $8,000.

- A paving business was forced to pay $8,60 to repair costs but was otherwise unaffected because the truck was a rental. <u>See</u> Victim #4.

- A sheet metal business reported having to pay over $2,500 in a deductible, lost access to its truck for over two weeks, and lost about $10,000 in productivity.  <u>See</u> Victim #5. The loss of their truck forced their work to be completed on overtime and made them unable to prepare for future job deliveries.

- Another business had to pay $1,000 in a deductible from a $7,428 repair claim and lost the use of their van for two months. <u>See</u> Victim #7.  During this period, the employees had to use their personal vehicles to get to the job sites.

- A food service business was forced to pay $8,200 in repair costs, and lost use of their truck for 21 days during repairs.  <u>See</u> Victim #8.

- A soil company had to pay $3,101 and lost use of their van for over three weeks during repairs.  <u>See</u> Victim #9. They reported about 5 to 10 hours in lost time as they dealt with the theft.

- One individual had to pay $798 to repair their Corolla, and lost use of their car for 26 days. <u>See</u> Victim #11. During that time, they had to pay about $5,000 in costs associated with getting around and doing mundane tasks like getting groceries and they suffered a $96 increase to their insurance premium.

- A kitchen business reported $5,648 in costs to repair their truck, and lost two days of productivity, and three delivery days that they were able to reschedule. <u>See</u> Victim #12.

- A financial service business reported $1,943 in costs to repair the vehicle, and while they did not experience any loss of business or wages, the "theft did affect [them] emotionally." <u>See</u> Victim #13.

- A food pantry was targeted twice, had to pay $2,318 in costs to repair, and lost access to their truck on eight days on each occasion. <u>See</u> Victim #14. The organization has one truck that helps them distribute assistance to 4,351 persons in 2023. The food pantry provided the following information in its victim statement (Exhibit 4):

    Last year 695,704 pounds of food was distributed to our neighbors at these locations.

    Another 38,713 pounds of food was sent home with children in partnership with our public school system to ensure that they had food over weekends.

17

Our food rescue program in partnership with Stop & Shop, Shaws, Whole Foods Market and B.J. 's allowed the pantry to collect 215,904 pounds of food, a critical resource we rely on to meet the needs of our neighbors.

All these programs were in jeopardy. But thanks to business owners in the community who provided us with use of their trucks when our truck was being repaired, we were able to conduct business as usual and are eternally grateful for their support.

Although our insurance company covered a majority of the costs, the out of pocket dollars were $2,318. Our organization raises money through donations, fundraisers as well as grants. We were very grateful to the donations we received to help cover the shortfall.

The food pantry is a volunteer based organization, and when word of the theft spread, many were brought to tears and outraged that someone could do this. After the 2nd theft, anger at this being done, not only to the food pantry, but to our neighbors in need, could not be measured. Our truck is a symbol of hope to - residents who are food insecure. We, as a community, felt violated in a way that cannot be quantified. To this day, we are still emotionally impacted by this crime, and wonder how individuals could be so callous as to impact our most vulnerable seniors, families and children.

Exhibit 4.

- One individual from Fitchburg reported being targeted twice and had to pay a $300 for each claim. See Victim #15.  The victim had to use two tows under AAA, and lost access to the vehicle for five days.  They suffered the loss of two days of pay and increases to their insurance premiums.  The victim noted the intrusive nature of the theft: the "car was parked in my own driveway at the time" and reported a sense of helplessness from suffering the crime twice, stating that "this is happening so much, not just in my area but everywhere. There needs to be something done to prevent someone from stealing" the converters.

- Another victim in Worcester, MA, had to pay a $1,000 deductible and lost access to their car for two weeks. See Victim #17.  They also had to pay for a rental car that cost them $120.

- Another victim in Abington, MA, suffered about $500 in costs due to the deductible, the tow, and gas. See Victim #18. She also lost use of the vehicle for over a week, had to use a vacation day to deal with theft, and the vehicle was not able to be repaired to original condition.  This victim became a "solo parent without a car" and was forced "to ask for rides to work and then borrowed a car" which was much less fuel efficient that added to the costs.

- An insulation business reported having to pay a $1,000 deductible for each of the two

trucks that were targeted, and then bore labor and repair costs of $1,200. <u>See</u> Victim 19. That business also had to wait 30 days for their insurance company to pay the claims and by the time the money to repair was received, they lost a few months of use of the trucks.  The business reported that their "[t]wo trucks could not provide services to customers. Jobs were delayed. Workers had no work. Lost income because we could not preform work for clients."  The owners reported stress that was caused because they could not go out and get their work done, and they wasted time replacing and repairing the vehicles, and noted that they the lost revenue and lost wages and work for their employees.

- An electrical company reported having to pay a $1,000 deductible and losing access to their truck for six days.  <u>See</u> Victim #20. They lost use of the "box truck used to deliver material/stock/tools to job sites" which "caused shipment delays, lost time, and delays to job schedules."

- An individual from Framingham, MA, reported that they had to pay a $500 deductible, but was able to get the repairs completed the same day. <u>See</u> Victim #21. The victim only had to lose a morning of work, but it was a "total inconvenience" because they work for an "hourly wage." The victim did note that it caused them "much stress and anxiety" regarding the "safety" of their family at home and caused them to spend another $500 in a security camera system.

- A home health care company reported having to pay about $6,000 in costs for rental vehicles in order to continue to serve their clients. <u>See</u> Victim #22.

- An individual from Framingham, MA reported that they paid a $500 deductible from a $3,000 claim and lost their vehicle for about a week of repairs. <u>See</u> Victim #23.  The victim also "[l]ost a day of work because of dealing with insurance, car rental, AAA, and repair shop."

- A victim from Shrewsbury, MA, reported that they paid $2,318 in costs, and lost a day of work and their son did not go to school. <u>See</u> Victim #24.  This victim also reported that they suffered a "very strong financial and psychological shock from which I still cannot recover."  Specifically, the victim had "great difficulty" in purchasing a car, and then about "two months later I had to pay another half of [the] cost of this car for repairs."

- A kitchen design company reported that they paid a $500 deductible and lost use of their truck for about 9 days. <u>See</u> Victim #25.  The business reported that "Each business day without a truck cost my company approximately $1000 per day related to lost business opportunities (product deliveries)." Aside from the business's bottom line, this also affected their customers as well. As the victim reported: "Each business day without a truck resulted in customers complaining that we could not deliver their materials. (We delivery critical building materials to homes undergoing kitchen renovations-delivery delays mean customers are without working kitchens.)"

- A sports company suffered $500 costs for the deductible off a total repair claim of

$6,500. See Victim 26. They lost the use of the work van for over a month during repairs, and this negatively affected their marketing because the van carries the business information on it.

- An individual in Abington, MA reported that they paid a $500 deductible off a $1,784 repair bill. See Victim #28. They lost the use of the vehicle for repairs and lost about one and a half-day of work because they were unable to work without their vehicle. This victim commented on the nature of the intrusion and believed "the theft was well planned and executed. The parking spaces are directly in front of our townhomes."

- An individual in Easthampton, MA reported having to pay a $1,000 deductible and $281 for a tow. See Victim #30. The victim lost the use of their car for three weeks and rented a car for a week. The victim is "disabled and it really put me off the edge. I was so upset, I couldn't go up and babysit my grandkids in Russell.so that I was really put out on that."

- A construction company had seven vehicles targeted and reported that they spent over $7,770 on temporary fixes to their trucks and anti-theft devices.  As that business reported:

  > The theft of the catalytic converters on 7 of our vehicles left us with the inability to utilize these 7 trucks and placed a significant strain on the remainder of our fleet, drivers, and warehouse staff. We value our commitment of Next Day delivery to our customers and this theft hindered our ability to meet our commitments.

  > Due to the rampant theft of catalytic converters in our region; we were unable to source new parts for some time and were left with no option but to place temporary fixes on these trucks. We contracted with a local welder who was able to install a temporary fix so that we could get these trucks back on the road. This temporary repair took 5 days to complete on these trucks which again; significantly hindered our ability to deliver product to our customers. This temporary fix alone cost us $2,200.00.

  > Although the cost of replacements and repairs is significant, the impact that actions had on our staff was far greater. The stresses of having to reschedule deliveries, move deliveries to other available vehicles, and all whilst ensuring our customers receive the same level of service that they would receive on any other given day. Our day to day is fast-paced yet extremely efficient and the stress of having our fleet impacted in this manner is one that we hope to never have to deal with again. To ensure that we do not have to face this ordeal in the future, we took the extreme measure of placing anti-theft devices in all of our fleet vehicles. The cost associated with these anti-theft devices was over $5,500, in 2022. And this is something we continue to add to any new fleet vehicle we purchase.

  > As stated above, the actions of had a great impact on our business. We incurred financial and delivery burdens as well as stress amongst our staff. And I can assure you that our Automobile policy premiums have been significantly

impacted as well due to this incident. [The Defendants] should be held accountable for the crimes he has committed and our region should be able to feel safe against this happening again in the future.

Exhibit 5.

One victim is worth emphasizing and the circumstances are emblematic of who the Defendant is an individual and criminal. The Defendant targeted a food pantry and stole the catalytic converter from its food delivery truck. As the Food Panty's victim impact statement makes clear, this was a simply cruel act. This theft impacted needy families who actually are struggling to make ends meet and prevented food from reaching their table.

In remarkable twist, the Defendant himself decided that paying for groceries with the money he was making stealing from food pantries was simply too much to bear. He applied for food stamps -- lying under oath about his income and bank account balances in the application, while he had six motorcycles in his basement, two jet skis in his backyard, and three vehicles in his driveway. *See* Exhibit 9. Not only did the Defendant steal from the American taxpayer and divert funds from welfare programs designed to help those less fortunate, but he was willing to destroy the truck used to actually deliver food to those who were the most vulnerable, the elderly, and infirm. All this, to make money for himself, and keep more of it in his pocket.

The nature of these crimes targeted others and had serious impacts on their lives. While the impact is not measured in physical injuries, there were emotional injuries, practical difficulties, frustration and stress that the crimes imposed, not to mention very significant financial setbacks that the victims suffered. There is a measure of just punishment that must be reflected in the sentence when, as here, the Defendant targets others and steals the time and peace of mind from the lives of so many. The government asks the Court to impose the requested 198 months, which properly reflects the Defendant's role in leading and orchestrating hundreds of thefts, negatively

affecting the lives of hundreds of individuals and businesses financially and emotionally and profiting in the process.

### 4. Statistical Impact Following Arrests

The impact of the investigation and dismantling of this theft crew, and the Defendant's role in this entire category of crime cannot be overstated. This context should be directly considered by this Court in terms of the "nature and circumstances" of the offense. Since the day of the coordinated takedown and arrests on April 12, 2023, to the days prior to the filing of this memorandum, there have been only nine (9) reported catalytic converter thefts in Massachusetts and local areas.[11] See Exhibit 1. By comparison, during the period of July 2022, through April 12, 2023, there were 258 catalytic converter theft incidents reported to Mass Crime Net and NESPIN (each incident generally comprised of multiple thefts taking place in a single city/town on a single night). The substance of this decline is also borne out by the dearth of media reports concerning catalytic converter thefts in Massachusetts since the arrests as well.

The government attributes this cessation to three developments all occurring relatively simultaneously. First, and foremost, the removal of this Defendant and his crew directly removed the most prolific catalytic converter thieves in the region. Second, there have aggressive prosecutions by other components of DOJ of entities responsible for buying stolen converters up the chain. Third, there was the recent passage of legislation in Massachusetts that required recordkeeping of converter sales. These developments have combined to end catalytic converter theft in this state. That being said, the Defendant continued to steal at a very high rate for months after these developments. Since the Defendant's arrest, however, there have been practically

---

[11] Since the report in Exhibit 1 was authored, there have been two additional thefts reported.

speaking zero converter thefts by any organized crews. This astonishing statistical drop-off should provide this Court insight into the nature and circumstances of this organized and sophisticated conspiracy, and how the crimes that they committed play into the larger landscape of catalytic converter thefts in this District.

While this conspiracy was in all likelihood not responsible for every catalytic converter theft reported to Mass Crime Net during the period of July 2022, through April 12, 2023, the nearly complete cessation of catalytic converter theft in Massachusetts speaks to how prolific this Defendant and his conspiracy were. In sum, the Defendant's conspiracy practically speaking accounted for most of the thefts.

Lastly, the Court should consider the impact on public safety and the numerous high-speed chases that resulted. The Defendant and his conspirators put the entire region on edge every night. Law enforcement altered their patterns, issued public service announcements, and hosted events where citizens could have their converters painted neon in order to make it less attractive to a would-be buyer. Rather than being focused on other issues plaguing their communities, hundreds of officers were focused on protecting their citizens and their property from a single Defendant, and the crew he led. Luckily for the residents and businesses of this state, Massachusetts is no longer open to catalytic converter thieves, and no one needs to fear the loss of their catalytic converters.  In the end, however, as the statistical decline shows, only incarceration and removal from society were successful in protecting the public from the Defendant.  Consequently, a significant term of imprisonment is warranted.

### 5.  Conclusion

Crimes of this caliber and sophistication committed by a dedicated and professional thief do not merit leniency or reduced sentences.  These are aggravating factors that do not, in the

government's estimation, afford for much mitigation on the part of the skilled offender, especially one like the Defendant whose life has been characterized by stealing from others. This is not a crime born of necessity, desperation, or addiction. Rather, these thefts are the product of concerted effort, discipline, and a honed mind. The Defendant invested considerable time and energy and applied technical skill in order to accomplish the crimes. To top it off, he executed the thefts with a cool precision over the many months, night after night, vehicle after vehicle, with a rotating cast of coconspirators, despite law enforcement's best efforts, and numerous high-speed chases.

The nature and circumstances of these crimes reflect the deliberate and considered choice to target and victimize others for personal gain. Because of the thefts, a business would suffer their entire fleet of vans being looted in one night, only to have other vehicles at a different location targeted on a later night. The individual victims were left with little recourse except to cobble together enough money to pay the deductible if it was low enough and rebuild what was left of their day and week after the inconvenience of losing their vehicle for the foreseeable future. The Defendant chose to target others and steal from other hardworking members of the community. The reason for this choice was obvious: the thousands of dollars in tax-free profits that he would make each night. As a result, the nature and circumstances of the thefts require a serious sentence consistent with the government's recommendation of 16.5 years.

### B.     NATURE AND CIRCUMSTANCES OF THE JEWELRY STORE BURGLARIES, ATM THEFTS AND OTHER CRIMES

The Defendant's other crimes are best considered in their timeline. Upon consideration, they too speak to the necessity of a sentence of at least 16 years.

#### 1.   ATM Thefts & Trailer Theft

The Defendant orchestrated the three ATM thefts. They successfully targeted one ATM stealing $21,809, failed to get the ATM onto the truck during a second incident, and cased a third

location that they did not actually target.

### a.  12/8/2022, Tyngsborough, MA

The first ATM theft committed by the Defendant, FELIBERTY and OYOLA was an Enterprise Bank ATM in Tyngsborough, MA.  *See* PSR ¶¶142-150, 266-268.  To commit this theft, they used a truck that they stole from South Windsor, CT.  They drove the stolen truck to Tyngsborough, MA and used hooked chains to pull the ATM out of the ground. They loaded the ATM on the truck within seconds and fled from responding police into New Hampshire with their lights off. The ATM itself would be recovered in Hudson, NH, and the stolen truck recovered in Windham, NH. All told, they made off with $21,809 in cash from the ATM and caused over $15,000 in damages.  Because the truck was dumped in New Hampshire, the Defendants clearly had to have utilized a second vehicle during the incident, either stashed in New Hampshire in anticipation of the theft, or another follow car.  This second vehicle was never identified.

The crime, its preparation and aftermath spanned three jurisdictions and involved at least one stolen vehicle, and at least one additional vehicle that was either staged in New Hampshire to facilitate the return trip after dumping the stolen car or serving in a dedicated role as a follow car. To give a sense of distance, the distance from Springfield, MA to South Windsor, CT, to Tyngsborough, MA, to Hudson, NH, to Windham, NH, and back to Springfield, MA is 260 miles. They had to prepare and bring chains and hooks to dislodge and steal the ATM. Additionally, they had to prepare and bring the tools necessary to break-open the ATM's vault, and bring those tools with them as they cracked open the vault in New Hampshire after running from police.

This was an elaborate operation with numerous incidental thefts and cross-jurisdictional efforts to conceal the connectedness of the crime. The Defendant orchestrated all of it as the leader, and this incident alone should merit a serious penalty.

### b.   12/13/2022 Lowell 5 Bank

On December 13, 2022, the Defendant, FELIBERY and OYOLA also cased a Lowell 5 Bank ATM in Chelmsford, MA. *See* PSR ¶¶151-155. They discussed the theft in text message and then travelled over 180 miles simply to get a sense of the location and determine whether it would be a viable target to hit.  Once there, they got out of the vehicle, walked around the ATM, and took photographs of it. Those photographs taken by the crew would be recovered for R. DAVILA's cell phone. Similarly, the ATM surveillance camera captured them approaching it, and walking around it and photographing it.  Ultimately, this ATM was not targeted. Again, this incident shows the planning and discernment in the Defendant's operation. For whatever reason, known only to the Defendant, the mastermind, they elected to not proceed with this theft. However, they had a number of other thefts they would undertake instead.

### c.   12/14/2022 Trailer, Grill and Snowblower Theft

On December 14, 2022, the very next night, the Defendant, FELIBERTY and OYOLA committed another string of thefts.  This evening started with the Defendant stealing a trailer from Hooksett, NH (PSR ¶¶194-202, 231, 272-274).

The same night as the trailer theft, the Defendant, FELIBERTY and OYOLA also committed the theft of seven snowblowers from a hardware store in Acton, MA. It appears that they cut the snowblowers from their locked cable and utilized the stolen trailer to transport them. The Defendant, Rafael DAVILA and OYOLA exchanged text messages about the cash split from the proceeds of the snowblowers, and DAVILA took photographs of them.   Some of the snowblowers would be recovered from Rafael DAVILA's storage unit and Nicolas DAVILA's residence (PSR 207).  The snowblowers were valued at $8,648.  This total evening involved over 270 miles of travel to commit the thefts and return back to Springfield, MA.  This sequence shows

the opportunistic nature of the Defendant. It was December, and rather than buy snowblowers for himself and his family, he decided to steal them.

The stolen trailer, snowblowers, and some Weber grills would be recovered at Rafael DAVILA's storage unit on April 12, 2023, along with the chains used to rip out the ATMs (PSR 231). The stolen trailer was valued at approximately $10,000 and the victim was only paid $8,300 for the claim. One of the snowblowers was also recovered at the Defendant's father's house in his garage (PSR ¶217).

### d.   12/15/2022 Chase Bank

On the following evening, December 15, 2022, the Defendant, FELIBERTY and OYOLA attempted to commit another ATM theft (PSR ¶¶156-168, 268-271). Like before, this theft involved a stolen truck. Stolen license plates were affixed to the truck and DAVILA's Dodge Challenger. These license plates were themselves stolen back in November 2022 from Andover, MA. The theft was skillfully executed as before. This time one of the thieves (believed to be FELIBERTY) used spray paint to cover the camera on the ATM. Then, from 3:10 AM to 3:13 AM, they dislodge the ATM, lift it up and determine that they cannot access the interior. They speed off at 3:14 AM and are gone before the police arrive at 3:16 AM. While no money was taken, they caused $65,000 in damage. Shortly thereafter, DAVILA's Dodge Challenger is seen by Maynard Police following the truck. Police attempted to stop the Challenger, and the Defendant took off at a high rate of speed, exceeding 90 mph and evading the officer.

### 2.   1/12/23 Jewelry Store Thefts

The jewelry store burglaries are particularly indicative of the skill and coordination of this crew of thieves (PSR ¶¶169-193, 275-285). These burglaries fit the pattern described by CW-1 of historical burglaries committed in 2008, 2009, and 2010, and the Defendant's prior conviction

27

from New York. *See* PSR ¶¶247, 357; Exhibit A.  Stolen jewelry would later be found in the Defendant's residence (PSR ¶295)

On January 12, 2023, the Defendant, OYOLA, and FELIBERTY successfully targeted two jewelry stores on the same night and conducted a distraction break-in to draw the police response. They entered each store and conducted the thefts with precision and a discernible timetable of leaving within two minutes.  In total, they stole over $137,000 in jewelry within minutes, and caused about $20,000 in damage.  In order to ensure they were successful, the Defendants scouted the jewelry stores the night before, travelling well over 240 miles.  During the break-ins, they again utilized a stolen Hyundai Sante Fe. They had stolen this vehicle on January 10, 2023, when they went to scout the locations, and then stashed the vehicle in an area strategically located near the stores for them to later use when they committed the burglaries.

### C.      Other Aspects of the Crimes: Leadership, Assets & Firearms

All told, this Court can ascertain the sophisticated, yet relentless nature of the crimes that the Defendant orchestrated. Even mundane thefts are meticulously planned and skillfully executed. Despite being arrested on similar charges, and repeatedly chased by police, the Defendant simply refuses to stop committing crimes, and merely increases the efforts used to conceal his involvement.

In fact, the Defendant as the regular driver was entirely willing and able to outrun police. He also undertook extra steps to steal cars and license plates, at time from hundreds of miles away, in order to reduce the potential for being caught.  The Defendant purposefully employed jurisdictional borders and geographic distance to insulate himself from scrutiny and would routinely travel hundreds of miles simply to look at whether he would target that location.  Most significantly, this Defendant was never caught in the act despite committing these thefts hundreds

of times and placing the entire region on alert. This success is due to the Defendant's skill in planning and executing the crimes and evading police. It required the concerted efforts of over 70 police forces and high-end investigative techniques brought by federal law enforcement to stop this Defendant.

### D.    Assets Accumulated

It is also important to note that the Defendant accumulated numerous vehicles and assets through these crimes.  As noted in the materials related to forfeiture, through these crimes the Defendant bought a Dodge Challenger, a Chevrolet Suburban, two jet skis, and six motorcycles along with a cache of tires and motor vehicle parts. His basement was mocked up in the manner of a showroom with banners and logos for the makes of the motorcycles he was adding to the "collection." *See* ECF #254-1.  From this, there is no exaggeration when the Defendant boasted that he "drives his bank account" and has "over 200K in assets." *See* ECF 254-1.

It was not just the Defendant who profited, but his family did as well. The Defendant paid over $23,000 to purchase a seventh motorcycle -- this one as a gift for his father November 2022 (the Honda Goldwing),[12] and had bought his father yet another motorcycle for $9,150 for Father's Day in 2021 (a Can-Am Spyder). *See* ECF #254-1, pp. 8, 13. Incidentally, the Defendant's father also received one of the stolen snowblowers (PSR ¶217). Each and every item obtained by the Defendant during this period was purchased with proceeds of these thefts.

### E.    Firearms

---

[12] The text messages surrounding the Gold Wing reveal that the Defendant and the seller colluded to falsely claim the motorcycle was purchased for $12,000 in order to avoid sales tax. *See* Exhibit 10, p. 40-44. The Defendant then outlined his scheme to avoid taxes in Massachusetts: the sale would have to be from the seller to his "buddies dealer[ship], then to [his] dad," because as the Defendant explained, in Massachusetts "we pay taxes on whatever the dealer paperwork says." Exhibit 10, p. 46.

It is also important to consider the fact that the Defendant was not just a thief. He was an extremely well-armed thief with multiple loaded firearms strategically stored around his apartment, and one in the Chevrolet Suburban. *See* PSR ¶¶226-230, 288-295. The primary purpose of these firearms was, obviously and ironically, was to protect himself and his accumulated assets from theft. One firearm was stored in his couch, readily accessible to him if an intruder came when he was watching television. The second was behind a nightstand, positioned for use if he was sleeping when someone attempted to him. The third was in the Suburban, close at hand if someone attempted to steal the converters or cash proceeds that he carried around. These three firearms are an aggravating factor that further distinguishes this Defendant and requires that he be sentenced to well over fifteen years in prison.

## II.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT

This Defendant is the face of recidivism, and of failed judicial practices toward sentencing. Dozens of past cases and lenient sentences have only emboldened the Defendant. The most recent suspended term of imprisonment imposed by Connecticut in 2021, was literally a get-of-jail free card that he paid forward by committing hundreds of catalytic converter thefts, burglaries, ATM thefts, and generally terrorizing a region. The perpetual cycle of victimization that has gone on since the Defendant's teenage years must end with this case, through more than 16 years in prison for the one individual who has harmed each and every victim in this case.

### A.    Criminal History

The Defendant's undisputed criminal history category is IV. While significant, the Defendant's criminal history is more remarkable for the sheer number of convictions and arrests. Tellingly, there has not been a year of the Defendant's life since age 15, where he was not on pretrial release with a case pending, serving a sentence, or subject to probation or parole. For the

Defendant, this federal sentence will be his seventh term of incarceration, and third prison sentence. The nature of all his prior offenses is largely the same: theft crimes, and motor vehicle offenses related to theft crimes. In this context, the Defendant's criminal history demands a lengthy term of incarceration.

### 1. Convictions

The Defendant has ten prior convictions. These range from disorderly conduct and reckless operation offenses to serious burglary and theft incidents where he was sentenced to multiple years in state prison. Even so, only five cases score under the guidelines. *See* PSR ¶¶356, 357, 358, 360, 363, 364-366. As an added aggravation of these offenses, the Defendant was subject to a criminal justice sentence at the time of all the thefts at issue in this case. *See* PSR ¶¶364-366. And this was no small sentence: he was on conditional release from a five-year state prison term from Connecticut during each and every theft in this case.

The Defendant's was first conviction in 2007 for malicious destruction of property, where he received probation (PSR ¶351). In 2009, the Defendant was then convicted of receiving stolen property, and, after violating probation, was sentenced to 6 months in custody (PSR ¶352).

In March 2009, the Defendant was convicted of receiving two stolen motor vehicles, defacing the VIN numbers, and larceny, and sentenced to probation, which he violated (PSR ¶353). In 2008 and 2009, the Defendant was also convicted of providing liquor to a person under 21 and disorderly conduct (PSR ¶¶354, 355). In 2010, the Defendant convicted of reckless driving and fined (PSR ¶355a). And in 2013, he was again convicted of reckless driving and placed on probation (PSR ¶356).

In 2015, the Defendant was convicted of burglary in New York and sentenced to 1 to 3 years in prison (PSR ¶357). During this incident, the Defendant and two other men broke into a

jewelry store, by smashing the window. Once inside, they broke the glass display cases and stole jewelry. For this case, the Defendant was ordered to pay $147,437 in restitution.

In 2020, the Defendant was convicted of concealing number plate and operating with a suspended license and sentenced to 90 days in custody (PSR ¶359).  The Defendant was observed driving a Chevrolet Tahoe that was towing a car trailer, but the license plates attached to the Tahoe were associated with a Nissan Sentra. The Defendant admitted that he took the license plates from a vehicle belonging to someone else.

In 2020, the Defendant was convicted of negligent operation, and sentenced to 90 days in custody (PSR ¶360).  For this incident, the Defendant was operating a black BMW sedan at high speeds. The license plate attached to the vehicle was associated with a Subaru and was cancelled. The Defendant initially pulled over for the officer, but then he "accelerated and sped away when the officer approached it on foot. The defendant who was operating the vehicle led police on a high-speed chase through multiple towns at excessive speeds and passing vehicles on the left before the police stopped the chase. The vehicle was subsequently located at a residence, and the defendant was stopped and arrested nearby." PSR ¶360. This case involved multiple jurisdictions, leading to charges being taken out by multiple police departments. *See* PSR ¶¶361, 362.

In 2021, the Defendant was convicted of operating a motor vehicle with a suspended license and sentenced to 59 days in custody (PSR ¶363). For this incident, the Defendant drove a red pickup into a tree, and lied to police about whether he was operating the vehicle. The Defendant provided a false social security number.

In 2021, the Defendant was convicted of larceny in Connecticut, and sentenced to 5 years in prison, suspended for 3 years (PSR ¶358). The Defendant was on probation for this case during the entirety of the criminal charged by Indictment in the federal case. This incident took place in

2019.  The Defendant stole a black motorcycle trailer and motorcycle inside that he was towing with a Chevrolet Tahoe. Connecticut Police responded, tried to stop the Defendant, but he took off and led them on a high-speed chase. The chase "reach[ed] speeds of up to 75 MPH before [the Defendant] crash[ed] the Tahoe into a tree. The trailer separated from the Tahoe, rolled over, and a motorcycle was thrown from the rear of the trailer. Police observed the defendant flee from the vehicle and take off running, leading police on a foot pursuit. Police threatened to use a taser on the defendant, but he refused to stop. Eventually police tackled the defendant and placed him under arrest." PSR ¶358.

### 2. Arrests

There are more than a dozen other cases where the Defendant was charged but not convicted.  These cases suggest that the Defendant is not amenable to rehabilitation and reflect a persistent and willful decision to commit crimes, despite having extensive experience with the criminal justice system. Those other arrests include:

- A 2005, complaint charging receiving stolen property, for which the Defendant, at age 16, was placed on pretrial probation (PSR ¶369);

- A 2006, complaint charging unlicensed operation, with an unknown disposition (age 17) (PSR ¶370);

- A 2007, complaint charging operating after suspended license that was dismissed (age 18) (PSR ¶371);

- A 2008, complaint charging larceny, larceny of a motor vehicle, breaking and entering into a vehicle at night for a felony, and malicious destruction, that was dismissed upon payment of restitution (age 19) (PSR ¶372).

- A 2009, complaint charging unlicensed operation of a motor vehicle (age 21) (PSR ¶373);

- A 2012, Indictment in Hampden County Superior Court charging Home Invasion, Armed Robbery, Armed Assault to Murder, and Assault and Battery by Means of a Dangerous Weapon that was dismissed without prejudice (age 23) (PSR ¶374);

- A 2012, complaint in Florida charging the Defendant with aggravated battery on

pregnant victim that was dismissed (PSR ¶375). The victim of this incident was the mother of the Defendant's children, who has also obtained a restraining order against the Defendant (PSR ¶397).

- A 2013, complaint charging operating with a suspended license, and concealed number plate that was dismissed (PSR ¶376).

- A 2014, complaint charging operating with a suspended license (PSR ¶378);

- A 2015, complaint charging failure to provide a DNA sample (PSR ¶379);

- A 2020, complaint charging three counts of receiving stolen property that was dismissed (PSR ¶380);

- A 2020, complaint charging vandalism and conspiracy to commit larceny that was dismissed upon payment of restitution (PSR ¶381)

- A 2021, complaint charging attaching wrong motor vehicle plates and operating with a suspended license that was dismissed (PSR ¶382).

- A 2022, Connecticut complaint charging evading responsibility for physical injury and illegal operation of a motor vehicle that was dismissed (PSR ¶383).

- A 2022, Connecticut complaint charging refusal of DNA sampling that was dismissed (PSR ¶384).

**B.     Specific Deterrence**

Specific deterrence is an incredibly important consideration as the Court weighs the length of the Defendant's third prison term. These were not crimes born of desperation, or addiction, or even the Defendant falling upon hard times.  Indeed, the Defendant seems to have had all the foundational support that one could ask for: a supportive family and children, a stable home, and technical skills in auto repair.  There is no explanation for the Defendant's career of crimes except greed and the fact that the Defendant knew there was much to gain, little chance to be caught and a comparatively small penalty if convicted.

The Defendant's trajectory is one in which past leniency was exploited and opportunities to reorient his life were squandered.  Those sentencing decisions in past cases did little in terms of curtailing the Defendant's behavior, and the results were many more victims of the Defendant –

and they can be measured by this Court in terms of the more than 800 hundred catalytic converter theft victims, jewelry store owners who lost large portions of their inventory and were forced to close for weeks due to repairs, banks whose ATMs were plundered or destroyed, and the persons whose vehicles were stolen or damaged to facilitate those crimes.  Had he been specifically deterred by his past sentences, he may not have found himself in these circumstances. Consequently, specific deterrence now, for this literal crime wave, is all the more important.

Theft and taking from others have marked the Defendant's life since he was a teenager. As the dozens of arrests and convictions demonstrate, the Defendant has been clearly proclaiming his life of crime for years and it is time that the criminal justice system take heed to what the Defendant has proudly saying about who he is and what he will do with his life.  Specific deterrence must be achieved through the sentence in this case. The sentence must be one that shifts this Defendant's thought processes and make clear that further crimes will not be tolerated and will be met by significant and severe penalties.

From this, the Court can see the need to advance the goals of specific deterrence through an incarcerated sentence of 198 months.  This case is exponentially more serious in terms of loss amount and number of incidents than any of his past convictions, or any of the codefendants. Indeed, the culpability of his codefendants pales in comparison to the Defendant's: they were not leaders, and they did cause anywhere near the same amount of loss.  The relevant conduct in this case includes the burglary of two jewelry stores, thefts from three ATMs, stealing converters from 800 vehicles, stealing a trailer, and stealing snowblowers, with a total loss amount of at least $3,500,000 in documented losses (even by Probation's flawed and underinclusive loss calculation).  In comparison to the 5-year sentence for which he was on probation at the time of this case for a single theft, the government's recommendation of 16.5 years is a considerable bulk-

discount for the Defendant's nightly commission of crimes and thefts for over three years.

Similarly, just punishment must also entail consideration of the sophisticated, coordinated and prolific number of thefts committed by a professional crew of thieves conducting a short-lived reunion tour of vehicles, banks and jewelry stores in the New England area. The Defendant was the leader of this crew, and his participation facilitated each and every theft. He provided the methods and practices that ensured their success and concealed their crimes from law enforcement. He provided the information that allowed them to increase their efficiency and target dozens of vehicles in a single night. He also focused their efforts and aimed them toward the most profitable vehicles. This "homework" took days of preparation and planning, and required dedicated effort to ensure the logistics of the conspiracy were working on all cylinders. In short, the Defendant worked extremely hard at stealing and helping others to steal. And this Court should have no reticence in imposing a sentence that is commensurate with the Defendant's role, the number of thefts, and millions of dollars in losses that he caused to hundreds of victims. Only a sentence north of fifteen years can meet these circumstances head-on and specifically deter the Defendant.

The government requests this Court impose a sentence of 16.5 years that will justly punishes the Defendant and reflect the seriousness of his crimes. Just punishment, however, must be cognizant of the fact that this particular Defendant has proven to this Court, and the Connecticut Superior Court that he will not be deterred, except by incarceration. In sum, a sentence of 198 months properly reflects the Defendant's wayward criminal history, will specifically deter him in a manner that lesser terms have failed to in the past, and will justly punish him for the hundreds of victims he harmed and millions of dollars in loss he caused in this case.

## III.    SENTENCES OF COCONSPIRATORS

The three other Defendants who have been sentenced thus far are Nicolas DAVILA,

Zachary MARSHALL, and Santo FELIBERTY.

- Nicolas DAVILA participated in the theft of 42 catalytic converters, unlawfully possessed an amount of drugs and a firearm.  Nicolas DAVILA was responsible for a total loss amount of $210,000, and he was criminal history category III.  Nicolas DAVILA received a sentence of 37 months.

- MARSHALL participated in the theft of 113 catalytic converters and stole $13,000 worth of tools.  MARSHALL was responsible for a total loss amount of $578,000, and he was criminal history category III.  MARSHALL received a sentence of 47 months.

- Santo FELIBERTY participated in the theft of 42 catalytic converters, broke into two jewelry stores, stole a trailer, stole snowblowers, burglarized two ATMs, and unlawfully possessed a firearm and ammunition.  FELIBERTY was responsible for a total loss amount of $554,064, and he was criminal history category II.  FELIBERTY received a sentence of 57 months.

In comparison to the coconspirators, this Defendant is far away and the most culpable, with a loss amount that is three million dollars greater than any of the sentenced codefendants.  While these codefendants certainly participated with the Defendant, none did so to the same extent, and his much greater guidelines sentencing range properly reflects this multi-million-dollar difference.  Beyond this, none of these codefendants had a leadership role. Indeed, other codefendants argued in mitigation that the Defendant was the leader, as the Court acknowledged.  *See* ECF $240, pp. 35-36 (Nicolas Davila sentencing argument: "Nick Davila was never a planner, never an organizer. He never would have come up with this on his own."), 221, p. 11 (Zachary Marshall sentencing memo: "Mr. Marshall did not act as the leader of the conspiracy. He did not plan or otherwise manage the logistics of the thefts."). This Defendant is also the only conspirator who possessed multiple firearms and accumulated assets to this extent.  Lastly, this Defendant has a much greater criminal record, for much more serious offenses, than any of his three sentenced codefendants.  Given the multiple millions of dollars more in losses he is responsible for, his role, the firearms, and his much more serious criminal history, there is no disparity in sentencing this Defendant to 16.5 years in prison.

## IV.    GENERAL DETERRENCE, PROMOTION OF RESPECT FOR THE LAW, AND PUBLIC PROTECTION

General deterrence and promotion of respect for the law must also be considered, and this Court should be extremely mindful of the message that the sentence will send to other thieves, catalytic converter and otherwise, and those who might be tempted by the potential for quick money through burglaries and thefts.  Additionally, other burglary and theft crews must be informed that thefts of this nature from businesses, banks and individuals will be met with a significant punishment and that such crimes simply are not worth the time and effort to undertake. To that end, this Court must ensure that a message of general deterrence is sent by the sentences in this case.

It is clear from the statistical decline described above that other professional criminals and catalytic converter thieves are watching this case.  This Defendant and his catalytic converter conspiracy are well known to other offenders, and the case made national news.  Fortunately, they have taken the suggestion to stay away from Massachusetts as they anticipate the state, local and federal response to such crimes will be as overwhelming in the future as it was for this case.  They are correct.  However, true deterrence and respect for the law are not messages that are sent through an extensive investigation, the shock of federal arrests, news stories and pretrial detention.  These are but temporary measures.

Rather, the understanding of the type of sentence and penalty that one can expect for these crimes is the heart of deterrence and must be a component of this Court's sentence.  See Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800 (1974) ("An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses.").

Moreover, general deterrence and its impact should weigh heavily in this case, where the sentence will be imposed in the only catalytic converter case brought in this District.  The same is true for the burglary and bank theft crimes – where, as the leader, this Defendant will set the standard for what deterrence means in these types of crimes as well.  Without other comparable cases, or a mandatory sentencing structure determined by Congress, there is no other prevailing sense that might otherwise inform criminals about the penalties besides the sentence actually imposed by the Court. Therefore, there is an unusual significance and need for this Court's sentence to reflect a message of general deterrence.  The government believes that the sentences in this case will serve as an example and warning to others, or, alternatively, an invitation.

In the government's estimation, a very strong message of general deterrence is sent by a 198-month sentence for a Defendant facing his sixth incarcerated sentence, and who has two prior state prison terms for similar crimes.  Other criminals will understand that theft of catalytic converters and burglaries will find them arrested and in Court, facing a federal case, and potentially a decade in a federal prison if they are repeat offenders.  They will understand that stealing from others on this scale is extremely serious and will not be met with leniency or disinterest – certainly not by law enforcement and not by the Court.  While a lengthy sentence may not prevent all forms of catalytic converter theft from returning, or deter others from targeting jewelry stores or ATMs, a 198-month sentence will ensure that the gains made by law enforcement do not quickly erode once the results of this case are known.

This sentence of 198-months for a career criminal such as the Defendant will also undoubtedly protect the public from the continued theft and the potential for other crimes being committed by the Defendant.  While incarcerated, there will be no more thefts and losses suffered from the Defendant and his cavalier attitude toward property rights.  There will also be zero 100

mph car chases involving this organized theft crew, and thereby, a reduced danger to the public.

A sentence of 198-months imprisonment is also the best means for the Court to protect the public generally and ensure that their vehicles, businesses, and property will not be targeted for the foreseeable future.  Alternatives, such as the threat of imprisonment while on probation, simply will not work, as they have not worked in the past. This case itself, is the result of such a decision. The sentence being sought by the government justly punish the Defendant for the wave of thefts he has committed, and the multiple firearms he is responsible for.  In short, public protection will be well-served by the government's recommendation – it will be accomplished through the Defendant's incarceration that will prevent him from committing these crimes.

Lastly, the swiftly imposed 198-month sentence certainly promotes respect for the law. The Defendant, and other offenders alike, will understand the certainty of imprisonment for vast criminal theft conspiracies.  Such a sentence will also promote respect for the law among those victimized and will let the public know that the Court will not excuse hurting hundreds of victims in this manner through a lesser sentence than what the law calls for.

## RESPONSE TO PROCEDURAL ORDER

In response to the Court's procedural order (ECF #236), the government responds as follows:

(a)     depending on the final GSR, the government's recommendation may constitute a variant sentence;

(b)     there are no legal questions that are not adequately addressed;

(b)     the government does not believe that the Defendant has sufficiently developed a factual dispute as to the loss amount, however, the government will have CW-1 available if needed to testify; furthermore, there are outstanding issues related to forfeiture that may require an evidentiary hearing, depending on the Court's rulings; CW-1 and Trooper Melberg will be available for testimony if needed as well.

## CONCLUSION

Based upon the foregoing, the government requests that the Court impose a sentence of 198 months, followed by three years of supervised release and the restitution in the amount of $150,295 as reflected in the PSR to the identified victims.  *See* PSR ¶438.

Respectfully submitted,

JOSHUA S. LEVY,
Acting United States Attorney

By:      */s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney

Date:   September 10, 2024