UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                               )   Docket No: 23-cr-10127-LTS<br>)<br>RAFAEL DAVILA                    ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

This case offers a unique window into the world of organized catalytic converter theft. There are cutters, individuals who identified vehicles with valuable catalytic converters and removed them in the dead of night.   There are middleman, individuals like Jose Torres, who purchased stolen catalytic converters and sold them for a fee. And there are industrial recyclers, who accepted untold amounts of catalytic converters without regard for their provenance and smelted them into profit.

The Defendant, Rafael Davila, was an active and prolific "cutter."   He has accepted responsibility for committing numerous catalytic converter thefts throughout 2022 and 2023. The government, in its memorandum, characterizes Mr. Davila as a "career criminal" who has been undeterred despite "years of prison."   *Govt. Sentencing Memo* at 1.   The government concludes that he is "unrepentant and largely incapable of rehabilitation" and therefore a sentence of 198 months (sixteen and a half years) is warranted.   *Id.*

As will be shown herein, however, Mr. Davila is hardly a "career criminal" and is deeply remorseful for his crimes.   He is 36 years old and the longest period of incarceration he has previously received was a 1-3 year sentence in New York, for which he was released and placed on parole after serving approximately 1 year.   His background, personal characteristics, and post-arrest conduct all demonstrate a capacity for growth and rehabilitation.   For these reasons,

the defense submits that a sentence of 80 months imprisonment, followed by three years of supervised, is "sufficient, but not greater than necessary" to serve the purposes of sentencing under 18 U.S.C. § 3553(a). Moreover, it would not create undue disparity relative to the sentences imposed on Mr. Davila's coconspirators for substantially similar conduct.[1]

## SENTENCING GUIDELINES

The presentence report (PSR) calculates the offense level to be 31. Mr. Davila's criminal history category is IV. Accordingly, the PSR finds the advisory guidelines sentencing range (GSR) to be 151-188 months imprisonment. Both parties have objected to this calculation.

The government has raised objections to (1) the manner in which the probation office treated testimony from a cooperating witness and the resulting estimate as to the loss amount, and (2) the failure to assign a two-level increase for the possession of firearms under USSG §2B1.1(b)(16)(B). Should the Court adopt the government's calculation, the offense level would be 35. The corresponding GSR would be 235-293 months imprisonment.

Mr. Davila has objected to a 4 level aggravating role adjustment under USSG §3B1.1(a), which he argues does not apply because he did not direct the actions of his coconspirators. Absent the 4 level role adjustment, Mr. Davila's offense level would be 27 and the corresponding GSR would be 100-125 months imprisonment. The parties' objections will be considered in turn.

## Loss Amount

---

[1] Sentences imposed on codefendants to date include 37 months (Nicolas Davila), 47 months (Zachary Marshall), and 57 months (Santo Feliberty). Mr. Davila acknowledges that his culpability is greater than his codefendants and therefore proposes a sentence nearly three years longer than those imposed on codefendants for similar conduct. In contrast, the government's recommendation would provide for a sentence well over 10 years greater than those received by Mr. Davila's coconspirators. This would run afoul of 18 U.S.C. § 3553(a)(6) directive to avoid unwarranted sentencing disparities among similarly situated defendants.

The government faults the probation office for failing to find that the loss amount exceeded $3.5 million dollars. The government asks the Court to fully credit the testimony of CW-1, who testified that he and Mr. Davila committed an estimated 275-300 catalytic converter thefts together in 2020 & 2021 prior to the particular thefts charged in the indictment. The Defendant maintains that there was no error in the calculation of the offense level, as CW-1's testimony is uncorroborated and should be rejected.

Mr. Davila objected to the inclusion in the PSR of CW-1's testimony regarding uncharged thefts occurring in 2020 and 2021. The government asks the Court to ignore the Defendant's timely objection, describing it as "rhetorical" and emphasizing that the Defendant had not proffered a countervailing affidavit or other evidence. *Govt. Sentencing Memo* at 4. This is burden shifting. It is black letter law, acknowledged by the government in their brief mere pages earlier, that the government bears the burden "to prove sentencing enhancement factors by a preponderance of the evidence, and a district court may base its determination on 'any evidence that it reasonably finds to be reliable.'" *United States v. Lacouture*, 835 F.3d 187, 189-90 (1st Cir. 2016) (internal citation omitted). There is no waiver here. The government asks the Court to credit CW-1's testimony, the Defendant has objected, and the Court must now resolve the issue.

And to be clear, Mr. Davila's objection is not simply pro forma. There is ample reason to doubt the accuracy and veracity of CW-1's testimony. To start, CW-1's estimate of 275-300 additional thefts is just that—an estimate. When initially questioned about the number of thefts committed with Mr. Davila and a second associate, CW-1 answered with some uncertainty, offering that the number was "maybe close to 200":

```
19        Q.    How many catalytic converters would you estimate
20   that you guys had done together, that group, those three
21   individuals?
22        A.    Just those three?  Maybe close to 200.
23        Q.    Two hundred?
24        A.    Yes.
```

CW-1 was similarly uncertain about the number of thefts committed together with only Mr. Davila:

```
14        Q.    Okay.  So you are working with Ralfie till he
15   breaks his leg.  How much -- how many cats would you say you
16   and Ralfie did before he broke his leg?
17        A.    I want to say maybe 75 to 100 cats.
18        Q.    So it's only a little bit of time?
19        A.    Yeah.  Because it was -- yeah.  Me and him, we
20   only worked for 2 months after ███████████████ passed
21   away.  We did it for like 3 months, 4 months.  And then he
22   broke his leg in the summer.
```

Not only did CW-1 hedge both of his answers with a prefatory "maybe," he also estimated the time period for the second group of thefts to be "2 months" and then, in the same breath, "3 months, 4 months." CW-1's uncertain estimates, standing alone, hardly inspire confidence in his accuracy and credibility.

Then there is the matter of corroboration and the lack thereof. The government points to five receipts seized from Mr. Davila's residence as confirmation of CW-1's testimony. *Govt.*

*Sentencing Memo* at 6.   But the five receipts do not document the sale of 275-300 converters. Rather, they reflect only the sale of only 60 catalytic converters.

Recognizing this deficiency, the government next focuses attention on various text message exchanges between Mr. Davila and an employee of the business where the stolen converters were sold (Accurate Recycling).   The messages are indeed highly significant, though not for the reasons offered by the government.   The government's interest in the text messages arises out of the fact that they reflect additional sales beyond those occasions documented in the receipts.   Closer scrutiny of the text messages, though, calls into question whether the catalytic converters referenced in those text messages were stolen at all.

Mr. Davila is an experienced "car guy."   He has worked at auto junkyards and, while self-employed, regularly purchased and re-sold cars (and car parts) for profit.   Often, his dealings with the employee at Accurate Recycling pertained to catalytic converters that he had obtained through his work in buying used vehicles and either fixing them up for re-sale or cannibalizing for parts, including catalytic converters.   This is reflected at numerous junctions in his text messages:

- *"I'm gonna junk this thing and head your way" (page 19):* Upon learning that the business is open, Mr. Davila sends a picture of a vehicle (omitted from the government's reproduction of the text message chain) and makes reference to "junking" the vehicle and selling the catalytic converter.



- *"How much are the 98-02 accord 4cyl cats doing rn. I know of a few of them for cheap" (page 21):* Mr. Davila inquires about the price of a particular model because he could obtain them cheaply in the resale market.

- *"I'm tryna buy these now if I land the deal I'll be over tomorrow" (page 37):* after checking prices for various models, Mr. Davila indicates he is attempting to purchase and will drop by after completing the purchase.

- *"05 Volvo S80 it's a big one" (page 41):* Mr. Davila inquires about pricing for a certain Volvo model, which he purchased used.   It so happens he retained the title:



- *"03 e350 van. Are these original?" (page 45):* Mr. Davila inquires as to the origin and pricing for catalytic converters associated with this van to determine whether it would be profitable to buy and sell the parts.   He did in fact purchase the van, which is reflected in contemporaneous photos:




- *"OK just checking I got a kid here with a bunch of them but he wants 750. I was just seeing if there was any meat on the bone thanks bro" (page 45):* after inquiring about pricing for certain catalytic converters, Mr. Davila indicates he is trying to strike a deal to purchase several, but wanted to determine if there was "any meat on the bone," ie— whether he could sell the converters for a greater price than the cost of acquiring them.

Viewed as a whole, the text message chain is consistent with Mr. Davila acquiring used vehicles on the secondary market and communicating with the Accurate employee in order to determine whether he could make a profit in selling them. The messages in no way support CW-1's claims of Mr. Davila's involvement in 275-300 catalytic converter sales in 2020 and 2021.

The government also cites the Defendant's bank records reflecting cash deposits and having accumulated assets as corroborative of CW-1's claims, referring the Court to an affidavit prepared by Trooper Melberg for the purposes of asset forfeiture. *Govt. Sentencing Memo* at 6. Trooper Melberg's affidavit, however, states that his review of bank records was limited to

statements issued "from January 1, 2022 to December 2022." Mr. Davila does not contest having engaged in catalytic converter theft in 2022. However, the operative time period as it relates to CW-1's testimony is 2020 & 2021 and Trooper Melberg's review of bank records did not purport to analyze that period. Moreover, the mere fact that the Defendant may have had some income in 2020 & 2021 is hardly proof that he was engaging in the thefts claimed by CW-1, particularly where there is credible evidence that Mr. Davila was engaging in the sale of used cars and car parts.

In sum, the government has not and cannot meet its burden of demonstrating loss in excess of $3.5 million dollars and the government's objection should be overruled.

Reckless Flight and Firearm Enhancements

The government next takes exception to the PSR's application of a two level enhancement for reckless conduct pursuant to §2B1.1(b)(16)(A). *Govt. Sentencing Memo* at 7. To the government's thinking, Mr. Davila should be assessed a two level increase for reckless flight under another provision, §3C1.2. Relatedly, the government also maintains that probation failed to assess a two level increase pursuant to §2B1.1(b)(16)(A) for possession of a firearm in connection with the offense. These arguments should be rejected for largely the reasons cited by the probation office in their thoughtful response.

The primary reason why §2B1.1(b)(16)(B) does not apply is found in the language of the guideline itself. This enhancement applies if the defendant possessed a dangerous weapon *in connection with the offense* (emphasis supplied). There is simply no evidence that any of the firearms seized from Mr. Davila or his coconspirators had any connection to the offense. The government's investigation of this case was extensive, involving an abundance of surveillance, business records, cell phone extractions revealing communications between coconspirators, etc. For all of the overwhelming evidence against Mr. Davila and his codefendants, the government

can point to nothing establishing that firearms played any role in the catalytic converter thefts. The lack of evidentiary support to the government's arguments is fatal, as the Court has already recognized in declining to applying the enhancement at the sentencing hearings for codefendants Nicolas Davila and Santo Feliberty.

`      Turning next to the matter of reckless flight, the presentence report correctly concluded that a two level enhancement applies under §2B1.1(b)(16)(A).   The government attempts to draw a distinction between the language of §2B1.1(b)(16)(A), which applies if *the offense involved* reckless conduct and §3C1.2, which applies if the reckless conduct occurred *during flight*.   Here, the offense conduct involves the transportation of stolen goods.   The high-speed chases comprising the reckless conduct were part of the offense itself—that is to say, they occurred during the transportation of stolen catalytic converters.   Accordingly, probation reasonably applied the §2B1.1(b)(16)(A) adjustment for reckless conduct.   Having done so, the government's proposed §3C1.2 adjustment is not available.   Application Note 1, USSG §3C1.2.   Accordingly, the Court should overrule the government's objections and apply the §2B1.1(b)(16)(A) enhancement, consistent with its earlier finding on this issue as to codefendant Zachary Marshall.

Davila's Objection to USSG §3B1.1(a) - Leadership

The Defendant objects to the PSR insofar as it concludes that he was an organizer or leader of a criminal activity involving five or more participants or was otherwise extensive. While Davila was no minor figure in the offense, he did not direct the actions of his co-conspirators—many of whom engaged in the same conduct independently from him.   In applying this adjustment, the Court must "distinguish between organizing criminal *activities* and organizing criminal *actors*."   *United States v. Hernandez*, 964 F.3d 95, 102 (1st Cir. 2020) (emphasis in original).   *Hernandez* continues: "Only the latter may be used to ground an

enhancement under 3B1.1(a)." *Id.* To qualify for organizer status, a defendant must direct the activities of at least one other participant. *See United States v. Ilarraza*, 963 F.3d 1 (1st Cir. 2020). If the defendant did not do so, a §3B1.1(a) enhancement does not apply. *See United States v. Sostre*, 967 F.2d 728, 733-34 (1st Cir. 1992).

Mr. Davila was nobody's boss. While he was surely more organized and involved in the planning aspects of the thefts than others, Mr. Davila was not the linchpin around which all catalytic converter theft occurred. The relationship between Mr. Davila and his coconspirators was not a hierarchy in which Mr. Davila was the unequivocal leader, but rather a loosely affiliated crew of like-minded individuals who sometimes collaborated depending on the job and the time frame. Many of the leadership qualities cited by the probation office in justifying the § 3B1.1(a) enhancement as to Mr. Davila could easily said of other participants. For instance:

- *Other participants committed catalytic converter thefts independently from Mr. Davila:*

  o By his own admission, after Mr. Davila broke his leg in the summer of 2021, CW-1 engaged in catalytic converter theft regularly with Santo Feliberty and a third individual. CW-1 testified this went on from roughly a month following Mr. Davila having broken his leg up until the time of his arrest, a period of well over a year. *See CW-1 Grand Jury Transcript* at 35-36.

  o Zachary Marshall was well versed in catalytic converter theft prior to becoming involved with Mr. Davila. A text message chain between Davila and Marshall captures the two comparing their experiences and. Of note, Marshall refers to having his own "man in Florida" who he dealt with. *See Complaint Affidavit, Appendix A (*ECF #4-1).

  o In addition to committing regular catalytic converter thefts with CW-1 for over a year without the involvement of Mr. Davila, Santo Feliberty was arrested in March of 2023 at a car dealership in Connecticut during an attempted theft. There is no evidence that Mr. Davila had any involvement in this incident. *See Govt. Sentencing Memo for Santo Feliberty* (ECF #201) at 22.

- *Davila was not the only individual responsible for coordinating and organizing the group's activities:*

  o Text messages between Santo Feliberty and Rafael Davila on January 10, 2023 in which Feliberty provides the time and location for meeting up prior to jewelry

- store burglaries (*See Complaint Affidavit*, ¶ 360);

- Text messages between Santo Feliberty and Alex Oyola on January 10, 2023 in which Feliberty provides the time and location for meeting up prior to jewelry store burglaries (See Complaint Affidavit, ¶ 363-364);

- In discussing Feliberty's role in particular, the government has previously argued that Feliberty "did not commit these aspects of the crimes on his own or make the vehicles he already stolen available to the conspiracy. The members of the conspiracy stole them together and used them together." *Govt. Objection to Presentence Report (*ECF #198, page 21, 23).   Furthermore, in the same filing, the government rejected the notion that "the number of thefts, locations of the thefts, the targeting of specific vehicles, and the logistics were all handled by R. DAVILA, not the defendant."   *Id.*   The government concluded: "To say that all the planning and preparation were handled by R. DAVILA alone is simply not accurate."   *Id.*

- *Davila was not the only individual responsible for monetizing stolen property:*

    - May 27, 2022 text messages between Nicolas Davila and Zachary Marshall include a discussion of Jose Torres's catalytic converter pricing (*See Complaint Affidavit*, ¶ 46);

    - January 13, 2023 text messages between Rafael Davila and Santo Feliberty wherein Feliberty researches current market price for gold (*See Complaint Affidavit*, ¶ 361);

    - January 15, 2023 text messages between Santo Feliberty and Alex Oyola in which Feliberty and Oyola discuss options for selling stolen jewelry (*See Complaint Affidavit*, ¶ 365).

- *Davila was not the only conspirator who recruited other participants:*

    - December 12, 2022 text messages between Rafael Davila and Santo Feliberty in which Feliberty confirms having recruited CW-1 to participate in the ATM theft (*See Complaint Affidavit*, ¶ 327).

In sum, it can be hardly be said that the Defendant "directed" the activities of his coconspirators where the evidence establishes that many of coconspirators engaged in substantially the same conduct separate and apart from Mr. Davila.

## DAVILA'S BACKGROUND AND PERSONAL CHARACTERISTICS

To hear the government tell it, Mr. Davila is not merely "the face of recidivism" but also of "failed judicial practices toward sentencing." *Govt. Sentencing Memo* at 30. The government cites "dozens of past cases and lenient sentences" as having emboldened Mr. Davila and asserts that his sentence in this case wall mark "his seventh term of incarceration." *Id.* at 30-31. At best, these statements are hyperbolic. But it is facts—not hyperbole and grandstanding—that must inform the Court's assessment of the sentencing factors under 18 U.S.C. § 3553(a).

Rafael Davila is not a career criminal, nor will his sentence in this case constitute his seventh term of incarceration. Mr. Davila recently turned 36 years old. He has been incarcerated on only two prior occasions. His first incarceration took place in 2015 after being convicted in New York state for a jewelry store burglary; he received a 1-3 year sentence and was released after serving approximately 1 year. PSR, ¶357. His second incarceration took place in the summer of 2020 when he served 90 days in a house of correction following a series of motor vehicle offenses. PSR, ¶360-363. At various points, the government's sentencing memorandum refers to the defendant receiving other custodial sentences, but the presentence report establishes that those references are either erroneous or refer to suspended sentences for which Mr. Davila served no custodial time.[2]

Far from the incorrigible criminal portrayed in the government's brief, Mr. Davila's background and personal characteristics reveal him to be a dedicated son, brother, father, and

---

[2] For instance, on page 31 of their memorandum, the government refers to Mr. Davila having been found in violation of probation and "sentenced to 6 months in custody." However, as the presentence report notes, the 6 month sentence was suspended and Mr. Davila's probation eventually terminated. PSR, ¶ 352. Similarly, the government reports that Mr. Davila was "sentenced to 90 days in custody" for a conviction for concealing a license plate and operating with a suspended license. *Id.* at 32. This is directly contradicted by the presentence report's description of the case, which reports that the matter was continued without a finding (CWOFed) and eventually dismissed.

friend whose considerable intelligence and energies have been regrettably misdirected. Mr. Davila's life revolves around his family. Mr. Davila's parents describe him as a "good son" who has been "respectful, responsible, and caring to our needs." *Raphael and Mildred Davila Letter.* His younger sister, Emily, with whom he is "inseparable," cites him as a formative influence in her life, teaching her "self respect and morals." *Emily Davila Letter.* His former partner, Loryann Olivieri, writes of how Mr. Davila earned the respect of her and her family for the manner in which he took on the role of "provider and protector" to her and her step-children and of her . *Loryann Olivieri Letter.* These themes echo throughout the letters of those who know him best.

Another theme that emerges from the letters of support provided by Mr. Davila's friends and family is his work ethic and drive. Though he has only a high school diploma and little technical training, Mr. Davila is a highly experienced mechanic and "car guy" who has long supported himself and his family by repairing and re-selling used cars and car parts. While these qualities were apparent in his commission of the offenses in this case, there is good reason to believe that Mr. Davila will prosper if those energies are harnessed in productive activity. Indeed, while detained at the Wyatt Detention Center, Mr. Davila has worked productively in several capacities, earning positive work evaluations. PSR, ¶ 4. He has completed a variety of programming offered through the facility and e-learning modules. *See Wyatt Program Certificates & E-Learning Transcripts.* He has also completed a variety of other educational programming and participated in an inmate-led restorative justice group (B.O.S.S.). *See BOSS Transcript; Letter of Harry Tam.*

In the course of his detention and participation in the B.O.S.S. program, Mr. Davila has attempted to reflect on the circumstances that led him astray. And to be clear, Mr. Davila acknowledges that greed and the lure of easy money was a potent motivator. But Mr. Davila's

commission of these crimes also coincided with a particularly trying period of time for Mr. Davila.   Mr. Davila's brother Joel passed away in late 2021.   He also lost a longtime friend to violence at roughly the same time.   These events took a toll on Mr. Davila and exacerbated his growing use of alcohol.   His use of alcohol also contributed to the demise of his longstanding relationship with Ms. Olivieri in 2022.

Since being detained, Mr. Davila has come to view his use of alcohol as problematic and has attended AA meetings.   The PSR finds Mr. Davila to be an appropriate candidate to participate in the Bureau of Prisons' RDAP program.   Accordingly, Mr. Davila requests that the Court include a sentencing recommendation that he be designated to an institution offering the RDAP program.

## SENTENCE RECOMMENDATION

Regardless of the guidelines arithmetic, fundamentally the Court is tasked with imposing a fair and just sentence in accordance with 18 U.S.C. § 3553(a).   To do so, the Court must balance competing considerations.   In aggravation, Mr. Davila's crimes were pervasive, methodically planned and carried out, and caused great harm to the many businesses and individuals who were affected.   Mr. Davila understands the wrongfulness of his conduct and appreciates that punishment must follow.

At the same time, the government's proposed sentence would have Mr. Davila incarcerated for over 16 years for nonviolent offenses where the primary harm was economic. In the defense's view, 16 and a half years is "greater than necessary" under the facts and circumstances of this case and would create unwarranted disparity relative to the sentences already imposed on Mr. Davila's codefendants.

While the nature of this prosecution is relatively unique, the Court does not write upon a blank page.   Mr. Davila does not quarrel with the proposition that his culpability is greater than

his codefendants.   His recommendation of 80 months appropriately provides for a sentence nearly three years longer than that received by Santo Feliberty (57 months), whose sentence was appropriately lengthier than those received by Zachary Marshall (47 months) and Nicolas Davila (37 months).   It is also consistent with the sorts of sentences imposed on other defendants with the same criminal history category sentenced under the same guidelines as determined in the presentence report; JSIN sentencing data reflects the average sentence imposed in such cases was 80 months, albeit in a limited number of cases (3).   PSR, ¶ 442.   Additionally, while this appears to be the first large-scale catalytic converter theft case brought in this district, there have been others elsewhere.   In one 2022 case, coincidentally out of Springfield in the District of Missouri, after admitting to having purchased tens of thousands of stolen catalytic converters with a value of greater than $1 million dollars, the lead defendant received a 70 month sentence, with coconspirators receiving sentences of 29 months imprisonment and 5 years probation.[3]

Moreover, a sentence of 80 months also balances the seriousness of the offenses and the need to provide for deterrence with Mr. Davila's relatively limited criminal record.   As discussed earlier, Mr. Davila has only been incarcerated on two occasions: once for slightly over 1 year and once for 90 days.   A sentence of 80 months in a federal prison is of a far greater magnitude than any sentence previously received by Mr. Davila and will serve to deter him specifically and the public generally.[4]   It would also recognize, to a degree, the efforts undertaken by Mr. Davila to rehabilitate himself and afford him needed educational and substance abuse treatment.

---

[3] https://www.ice.gov/news/releases/hsi-law-enforcement-partner-investigation-results-sentencing-3-defendants-scheme (last accessed Sept. 23, 2024).
[4] It is worth noting that a confluence of events—including aggressive enforcement, legislation regulating catalytic converter sales, and a collapse in the prices of the precious metals found in catalytic converters—has already led to a notable decline in catalytic converter thefts.

For all the foregoing reasons, Rafael Davila therefore requests that the Court sentence him to 80 months imprisonment, to be followed by three years of supervised release.

## FORFEITURE

The government has moved for the forfeiture of a number of items, arguing that they represent the proceeds of uncharged catalytic converter thefts perpetrated by the Defendant in 2020 & 2021.   ECF #254.   Mr. Davila has already objected to forfeiture on the grounds that forfeiture is not available as to uncharged conduct.   ECF #264.   To date, this dispute remains unresolved.   To the extent that the Court may be prepared to overrule that objection, and for the reasons expressed herein, the Defendant objects to the entry of an order of forfeiture on the basis that the government has not sufficiently established that the assets in question represent the proceeds of catalytic converter thefts.   Mr. Davila does not presently anticipate presenting further testimony at the sentencing hearing, but reserves the right to cross-examine government witnesses and present rebuttal evidence as necessary.[5]

Respectfully submitted,
*/s/ Scott Lauer*
Scott Lauer,
   B.B.O.: 667807
Assistant Federal Public Defender
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA   02210
617-223-8061  (phone)
617-223-8080  (fax)

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically

---

[5] The defendant understands that the government is prepared to call witnesses, including CW-1, at the sentencing hearing for the purposes of determining applicable forfeiture.

to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 24, 2024.   A copy is also being provided to Senior U.S. Probation Officer Martha Victoria via email.

<u>*/s/ Scott Lauer*</u>  
Scott Lauer